The SHERMAN R. SMOOT COMPANY, INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Defendant.

Civ. A. No. 81–0511.

United States District Court, District of Columbia.

April 16, 1981.

Charles S. Carter, Washington, D. C., J. Jeffrey McNealey, Columbus, Ohio, for plaintiff.

W. George Jameson, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Pending before the Court are the cross-motions of the parties for summary judgment and that of the defendants to dismiss this action. Plaintiff, the Sherman R. Smoot Company ("Smoot") of Columbus, Ohio, seeks injunctive and declaratory relief as well as damages against defendants, the United States Department of Transportation ("DOT") and the Federal Railroad Administration ("FRA"). The Secretary of Transportation ("the Secretary") has delegated to the FRA the authority to implement the Northeast Corridor Improvement Project ("NECIP") aimed at rehabilitating the rail corridor between Boston, Massachusetts and Washington, D. C. The NECIP includes track maintenance and reconstruction as well as the refurbishing of fifteen stations along the corridor, including Baltimore Penn Station in Baltimore, Maryland. A dispute over the project in Baltimore underlies this complaint.

Smoot is an enterprise owned by individuals who qualify as disadvantaged under 15 U.S.C. § 631 and are therefore entitled to participation in the program set out in Section 2[8](a) of the Small Business Act, which authorizes the Small Business Administration ("SBA") to contract with procuring agencies for government work and then to subcontract the actual work to a firm that qualifies as a minority business. On March 7, 1980, the FRA Contracting Officer wrote to the SBA expressing an interest in negotiating with Smoot for the project at the Baltimore Penn Station and enclosing a summary of the work then estimated to cost between four and six million dollars. The SBA responded on March 31 naming Smoot as capable of performing the work and requesting that the procurement for the Baltimore project be reserved for a Section 2[8](a) award to the SBA. In a letter of April 15, the Contracting Officer notified SBA of FRA's commitment to award a contract under § 2[8](a) to the SBA, with the requirement that Smoot begin work on the project no later than September 30, 1980. The officer additionally indicated that specifications and estimates would be available for Smoot approximately May 15, 1980. On May 22, preliminary, but not final specifications were forwarded to Smoot.

The Contracting Officer sent on June 20, 1980 a construction format to the SBA for Smoot's perusal, but the letter from the Officer indicated that FRA had not been able to make available final specifications on May 15 and anticipated that SBA should receive the documents no later than July 15. SBA was requested to inform FRA if this delay would hinder start-up by the September 30 projected date. SBA responded on July 7 that if the additional materials were received on July 15 and if negotiations began no later than August 15, sufficient time would be provided to commence work on September 30. On July 8, 1980, FRA furnished the complete specifications to the SBA. Between this date and August 14, Smoot, representatives of the procuring agency, and the agency's engineer met to discuss the project, Smoot raising a number of questions concerning the scope of the work to be done.

On August 14, the FRA sent to SBA a summary of its estimate, followed two weeks later with a complete detailed cost estimate with supporting materials. The FRA's estimate was $4,551,400 for the basic

work plus $130,000 for some additional mechanical work. Smoot submitted its proposal on September 4, 1980, amounting to $7,808,026 plus $178,673 for the mechanical repairs. Given the great difference between the two estimates, the parties met in mid-September to negotiate their respective prices. Additionally, FRA raised questions concerning alleged excesses in Smoot's cost estimates. On September 17, Smoot submitted a revised proposal of $7,058,217 for the basic project, a reduction of about $800,000. Approximately two weeks later, Smoot sent a telegram to FRA citing the price reduction and requesting a detailed itemized cost estimate which it claims never to have received.

The Defense Contract Audit Agency provided DOT on October 8 with an audit report of Smoot that concluded that Smoot's cost was unacceptable, with nearly $2 million as unsupported. After further negotiations, the FRA informed the SBA by letter of October 14 that the FRA would raise the amount it was willing to pay by $500,000 to approximately $5,000,000 based on an informal adjustment to the cost estimate, and FRA added an additional $500,000 to reflect its desire that the contract be awarded under Section 2[8](a). FRA requested SBA's reply by October 17. On October 21, the parties met for more negotiations and the SBA offered to sign a contract for $6.25 million, making up the amount to Smoot's estimate of $7 million with its own funds authorized for business development. FRA asserted that it could pay no more than $5.5 million, and the SBA responded by requesting another cost estimate, which the FRA ordered on October 23. Six days later, FRA requested from SBA a response to its offer of $5.5 million. SBA responded on November 4, 1980 with a "final price" of $6.25 million and an allegation that the FRA's cost estimate had no true basis in fact.

The revised estimate was completed November 19 and it reflected that a more realistic cost would approach $5 million; FRA that day wrote to SBA and reaffirmed its $5.5 million proposal, requesting a rapid response to avoid the need to place the contract on the open market and out of the § 2[8](a) program. On November 28, the Contracting Officer recommended to the head of the NECIP that the § 2[8](a) award be cancelled and that the project be placed for bids on the open market. SBA responded on December 4 that submission of the project for competitive bids would violate section 2[8](a) and requested that the matter be submitted to the Secretary for review; six days later, the Contracting Officer notified SBA that he was exercising his discretion not to award a 2[8](a) contract for the Baltimore Penn Station. SBA sent a telegram to FRA on December 11 requesting that the notice for competitive bids be withdrawn for one more review, which FRA agreed to complete. On December 30, FRA decided to open the project for competitive bids.

On January 6, 1981, SBA protested the decision to withdraw the contract from § 2[8](a) status, and two days later the SBA requested from the Secretary a review of the entire collapse of negotiations. Bids for the project were due on March 4, but on March 3, plaintiff filed a motion for a temporary restraining order to prevent FRA from opening the bids. The next day, the Court denied the motion and the bids were opened March 5. FRA received two bids, one from a small business for $4.8 million plus $750,000 for the additive work, and the other for $5.962 million plus $150,000. On April 2, the day before oral argument was to be heard on the merits of Smoot's complaint, the Secretary of Transportation, Drew Lewis, affirmed the FRA's decision to withdraw the contract from § 2[8](a) status on the ground that despite a good faith effort by FRA, negotiations were not fruitful in reaching an agreement and, despite the fact that further negotiations might possibly have been successful, the FRA properly decided that further delay would only increase the cost of the project and thus was justified in receiving competitive bids.

■ The question presented by defendants' motions is whether FRA's withdrawal

of the Baltimore Penn Station Project from section 2[8](a) status and from Smoot constituted an unlawful abuse of agency discretion. FRA maintains that there is no statutory or regulatory prohibition against withdrawal and that the failure of prior negotiations, rapidly escalating construction costs, and the submission of at least one bid in line with FRA's estimate serve to justify the agency's decision. Smoot counters with the contention that permitting an agency to withdraw a contract from the SBA after it had already been deemed a § 2[8](a) contract frustrates Congress's objective to ensure that agencies offer opportunities to minority owned business enterprises for government contracts. To affirm the agency's action, Smoot argues, would be to remove any accountability from the § 2[8](a) program and to permit agencies to run roughshod over the statutory mandate. Additionally, Smoot maintains that FRA violated applicable regulations that proscribe all activity on a contract pending an appeal of agency action to the head of the agency or the Secretary of the appropriate department.

Section 2[8](a)(1)(A) of the Small Business Act provides that an agency procurement officer

> ... shall be authorized in his discretion to let such procurement contract to the [Small Business] Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer. Whenever the Administration and such procurement officer fail to agree, the matter shall be submitted for determination to the Secretary or the head of the appropriate department or agency by the Administrator.

15 U.S.C. § 637(a)(1)(A). There appears to be no statutory provision governing the decision of an agency to withdraw its submission of a contract to the SBA for subcontracting to a minority owned business.

The scope of review over this matter is limited. The only inquiry is whether the agency considered fairly all relevant factors and reached a rational, supported conclusion, and it is immaterial that a Court might have reached a different result. *See M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971). To be sure, Congress established a special procurement policy concerning minority owned businesses, but the section 2[8](a) program does not vest the Court with greater power than usual to overturn an agency decision. The question whether section 2[8](a) contract procurements require more intense scrutiny in light of Congress's special objective to open additional opportunities for minority owned businesses need not be decided herein, however, because based on the documentary evidence and affidavits submitted by the parties, under even a stricter standard of review, there are no material questions of fact presented and the defendants are entitled to judgment as a matter of law.

It is a sad reality of life that each day the cost of living rises, sparing none. The inflation of expenses appears particularly acute in the construction industry, where the costs of labor and materials escalate quickly. When a project is estimated to cost close to five million dollars, each day's delay adds a substantial increase to the builder's expenses, and when the builders are the taxpayers, this burden is shouldered by all. FRA in this case attempted to negotiate with Smoot from August to November, 1980. At the request of the plaintiff, FRA re-audited its cost estimate and increased the amount it was willing to expend for the project, adding an extra $500,000 to show its commitment to the section 2[8](a) program, resulting in an eventual increase of 20% in the offering price. Smoot, in response and with help from the SBA, moved 10% downward in what it would charge for the work. Even after these negotiations failed, FRA reversed its decision to let the contract for public bidding to make one more attempt to resolve its differences with Smoot, resulting in further delays and eventual failure. To be sure, neither party can escape blame free for the breakdown of negotiations. It appears that FRA was constantly dilatory in submitting specifications and cost estimates to Smoot, *see, e. g.,* Affidavit of Jack E. Cochran at

¶ 5; Affidavit of Lewis S. Smoot, Sr. at ¶ 3, and Smoot continually attempted to obtain clarification from FRA on a number of items. On the other hand, FRA's representatives felt that Smoot's high price was unjustified because its cost estimates were inflated and because it provided for little, if any, competition among sub-contractors. *See, e. g.*, Affidavit of Theodore Pershyn at ¶ 7–B; Affidavit of John F. Black at ¶¶ 9, 12. Nevertheless, the case simply presents an instance of a failure of a meeting of the minds, *see* Smoot Aff. at ¶¶ 5–6, and it is surely not unusual for parties to negotiate over dollars and cents and not reach agreement; FRA's frank recognition that negotiations were reaching the point of diminishing returns was not made in bad faith and thus its withdrawal of the project from § 2[8](a) status was not an abuse of discretion.[1]

FRA has now opened the bids on the Baltimore project and has discovered that the apparent low bidder is a small business who at this stage represents that it can perform the work for FRA within the agency's budget. The agency is currently investigating whether this bidder is responsive fully to the bid proposal and a responsible contractor. To cause further delays and additional cost increases by forcing the parties to this case to negotiate, once again, for thirty more days, as plaintiff requests, with no assurance that a contract will be reached, would be a fruitless exercise.

■ There remains for resolution plaintiff's allegation that FRA violated the Code of Federal Regulations in proceeding to open the bidding to the public while an appeal is pending to the Secretary of Transportation. 41 C.F.R. § 1–1.706 provides that all activity on a contract is to cease pending an appeal to the appropriate agency official. The defendants maintain however, and properly so, that this regulation does not apply to section 2[8](a) programs; rather, it is aimed at contracts under 15 U.S.C. § 644, which provides for an agency to set aside a procurement for *competition* only among small businesses. *See* 41 C.F.R. § 1–1.706–1(a). The regulation governing section 2[8](a) programs that might be applicable to the instant action was not violated. 41 C.F.R. § 1–1.713–4(f) provides in pertinent part:

> If negotiations are not completed within the time frame established by the procuring agency, the designated procuring activity may notify the SBA that it intends to proceed with the procurement without further regard to the section 8(a) procedures, unless additional time is requested by SBA and granted by the procuring activity after due consideration for the urgency of the proposed procurement.

The initial time frame established by FRA had long since past, but, nevertheless, FRA attempted to reach agreement in October and November, culminating after a final audit and review in late December with its decision to open the bidding to normal competitive procedures without regard for section 2[8](a). FRA had fulfilled both the letter of this regulation and the spirit of the § 2[8](a) program in attempting to negotiate with Smoot. While neither party can be praised for its great flexibility or promptness, FRA cannot be charged with arbitrary or capricious decision-making after it had delayed the Baltimore project in order to attempt agreement with Smoot. When the time period lapsed and when FRA denied any further requests for extensions by Smoot, FRA was wholly justified in removing the contract from § 2[8](a) consideration and accepting public bids.

---

1. Although the question appears to be one of first judicial impression, the Comptroller General has concluded that an agency may properly decide to withdraw a contract from section 2[8](a).

> By statute, a Government contracting officer, however, is authorized "in his discretion" to let the contract to SBA upon terms and conditions agreed to between the SBA and the procuring agency. Therefore, we have held that the contracting agencies and SBA have broad discretionary authority in this area. This is so regardless of whether the action being challenged relates to a procuring agency decision not to set aside a procurement for a noncompetitive section 8(a) award, or to an agency decision to withdraw a procurement from the section 8(a) program.

*Mills Enterprises, Inc.*, B–196152, October 16, 1979, 79–2 CPD 260 (citations omitted).

Finally, the Secretary of Transportation, Drew Lewis, reviewed the FRA's decision after the entire matter was brought to his attention by the SBA. The Secretary, in his April 2, 1981 letter found that

[w]hen negotiations continued beyond [September 30, 1980] and proved to be unfruitful in closing the large difference between the Government estimate and the 8(a) subcontractor's proposed price, the contracting officer's action in withdrawing the procurement from the 8(a) program on December 10, 1980 was justified. The contracting officer further accommodated the SBA by cancelling the announcement [of public bidding] and reviewing the matter once again. I believe that the contracting officer's final decision stated in his letter of December 30, 1980, was proper under the circumstances.

The Court concurs with the Secretary's determination. Accordingly, summary judgment will be entered in favor of the defendants.