**HARRIS SYSTEMS INTERNATIONAL, INC.**

v.

**The UNITED STATES.**

No. 162–84C.

United States Claims Court.

April 20, 1984.

Joe R. Reeder, Washington, D.C., for plaintiff. Steven M. Schneebaum, Andrea L. Fischer and Patton, Boggs & Blow, Washington, D.C., of counsel.

Sharon Y. Eubanks, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Major Sam Roser and Major Robert A. Tepfer, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

This case comes before the court on plaintiff's application for a temporary restraining order and a motion for a preliminary injunction filed on April 2, 1984. In support of these requests, plaintiff contemporaneously filed a verified complaint, to which was appended a number of exhibits in support of said requests.[1] After three days of discovery depositions during the period April 9–11, 1984, a hearing on the merits was held on April 12–13, 1984, at which time the testimony of witnesses was received and exhibits were introduced into evidence.

In its requests and in its verified complaint, plaintiff seeks to enjoin the United States Department of the Air Force (Air Force) from taking any action relative to the procurement and/or performance of janitorial and custodial services at Kelly Air Force Base, Texas, beginning May 1, 1984. Plaintiff is presently performing said janitorial and custodial services at Kelly Air Force Base under the first option year provision of an April 30, 1982, subcontract (No. SB6338(a)–82C–7040) with the Small Business Administration (SBA) in conjunction with a prime contract (No. FA1800–82–R0036) between the SBA and the Air Force relative to said janitorial and custodial services. The subcontract contained a provision which gave the Air Force the unilateral right to exercise the option to extend the subcontract for two successive one-year periods. While the Air Force exercised the option and extended the contract for the first option period (May 1, 1983—April 30, 1984), it has notified plaintiff, the subcontractor, and the SBA, the prime contractor, that it would not exercise

---

1. The agency involved, the United States Department of the Air Force (Air Force) agreed to maintain the status quo until April 13, 1984, later extended to April 20, 1984. This action served to permit deferral of a ruling on the application for a temporary restraining order and allowed for consolidation and consideration of the merits of the requests and the verified complaint at the same time.

the option to extend the subcontract for the second option period (May 1, 1984—April 30, 1985).

This refusal on the part of the Air Force to exercise the second year option to extend plaintiff's subcontract, resulted in a decision by the Air Force to issue a Request For Proposal (RFP) relative to the janitorial and custodial services presently being performed by plaintiff under the first option year of its subcontract which will conclude on April 30, 1984.[2]

The SBA wished to keep the performance of the Kelly Air Force Base janitorial and custodial services under the section 8(a) program. However, the Air Force, dissatisfied with plaintiff's performance under its existing subcontract, advised the SBA that it would remain in the section 8(a) program only if the SBA designated someone other than plaintiff as the section 8(a) contractor. Under 15 U.S.C. § 637(a)(1)(C), the SBA was authorized to designate the subcontractor in a section 8(a) program undertaking.[3] After much discussion with the Air Force, and although the SBA believed plaintiff was an appropriate section 8(a) contractor, the SBA selected another section 8(a) contractor, San Antonio General Maintenance, Inc. (San Antonio), on or about February 16, 1984, as its designated subcontractor and so advised the Air Force. The SBA made this determination because of its desire to keep performance of the Kelly Air Force Base janitorial and custodial services in the section 8(a) program, and because the Air Force convinced the SBA that the Air Force's dissatisfaction with plaintiff's performance on the existing contract was justified. After this designation, the Air Force, on or about March 6, 1984, sent to the SBA and San Antonio RFP No. F41800–84–R9998.

Plaintiff interrupted the dealings between the Air Force, the SBA and San Antonio by filing the requests for injunctive relief mentioned above in which it seeks to enjoin the Air Force, the SBA and San Antonio from entering into a prime and subcontract in response to RFP No. F41800–84–R9998 which pertained to the performance of janitorial and custodial services at Kelly Air Force Base. Plaintiff charges the Air Force with bad faith in advising the SBA that it would not accept plaintiff as a section 8(a) contractor relative to the performance of janitorial and custodial services at Kelly Air Force Base and thereby, in effect, prevented plaintiff from being designated by the SBA as the section 8(a) contractor relative to RFP No. F41800–84–R9998.

I.

The section 8(a) program is codified in 15 U.S.C. § 637 (1982). This program is designed to develop the ownership of businesses by socially and economically disadvantaged individuals and to provide assistance to those businesses so that they can develop into independent firms capable of competing in the market place without special assistance from the government. *See* 15 U.S.C. § 631(e)(2)(A) (1982). One of the methods utilized in providing assistance under this program is a section 8(a) contract. 15 U.S.C. §§ 631(e)(2), 637(a) (1982).

In essence, a section 8(a) contract is one in which the SBA contracts with a federal agency having procurement powers for the performance by the SBA of the work required under a so-called prime contract. In turn, the SBA subcontracts the actual performance of the work to a section 8(a) contractor who the SBA determines to be a socially and economically disadvantaged small business concern. 15 U.S.C. § 637(a)(1)(C) (1982). This procedure allows a section 8(a) contractor, either alone

---

**2.** This rather unusual contractual relationship between the Air Force, the SBA and plaintiff was governed and controlled by the Small Business Act, particularly 15 U.S.C. § 637(a) (1982). A subcontractor, such as plaintiff, participating in this SBA program generally is referred to as a "section 8(a) contractor" and this program is

generally referred to as the "section 8(a) program."

**3.** The Air Force, under 15 U.S.C. § 637(a)(1)(A), has discretion relative to participation in the section 8(a) program.

or together with the SBA, to negotiate the terms of the contract with Air Force rather than being required to bid on the contract. Under this program, the SBA provides technical and managerial support to a section 8(a) contractor in the performance of a subcontract. 15 U.S.C. § 637(a)(7) (1982). It seems fair to say that the sequence of procedures in this tripartite situation can vary in any given circumstance.

Plaintiff is a Texas corporation with its principal place of business in San Antonio. In 1973, plaintiff was determined to be a socially and economically disadvantaged minority-owned small business concern by the SBA. In this regard, plaintiff had submitted to the SBA a business plan which set forth its financial, managerial and performance capabilities and the types of contracts it could perform. Plaintiff first became a section 8(a) contractor at Kelly Air Force Base in March 1973. Plaintiff, under various corporate names, performed as a section 8(a) contractor at Kelly Air Force Base from March 1973 through April 1982 performing janitorial and custodial services.

Throughout the period March 1973—April 1982, plaintiff's subcontracts were modified from time to time to reflect changes in inspection practices, cleaning schedules and standards, and custodial service needs reflecting variations in facility usage, priorities, weather and other factors. Each of the subcontracts under which plaintiff performed its janitorial and custodial services provided for the deduction of payments to plaintiff in the event of substandard or inadequate work performance by plaintiff. Such deductions were taken after a certain number of work discrepancies were found in the performance of particular categories of required work. Between March 1973 and April 1982, plaintiff suffered deductions for inadequate work performance on occasions. The record does not reflect the scope of these deductions, but since plaintiff continued as

a section 8(a) contractor at Kelly Air Force Base during this period, it is reasonable to assume that these deductions were not frequent or numerous and that plaintiff during the period March 1973—April 1982 satisfactorily performed the services required under its subcontracts with the SBA.

Effective May 1, 1982, the Air Force contracted with the SBA and the SBA subcontracted with plaintiff relative to performance of janitorial and custodial services at Kelly Air Force Base. In other words, plaintiff continued on as a section 8(a) contractor at Kelly Air Force Base. Both the prime contract and the subcontract were one-year contracts which ran from May 1, 1982, through April 30, 1983.[4] Both contracts gave the Air Force the unilateral option to renew the contracts for two successive one-year periods, *i.e.*, from May 1, 1983, through April 30, 1984 (which option was exercised by Air Force), and from May 1, 1984, through April 30, 1985 (which option the Air Force declined to exercise). The price of this contract for the option year ending April 30, 1984, was $2,470,076. Under these contracts, plaintiff was subject to random inspections to determine whether it was performing its subcontract in a satisfactory manner. The subcontract permitted plaintiff up to 21 performance deficiencies in designated work categories before payment deductions were permitted to be taken based on deficiencies in excess thereof.

Following the completion of the first year of the 1982 contracts, the Air Force exercised its option and renewed the contracts for the option period May 1, 1983—April 30, 1984. In exercising this option, the Air Force, in formal documentation, stated that plaintiff was performing services under its existing subcontract in a satisfactory manner. The contracting officer who signed this documentation on behalf of the Air Force testified that this affirmation of plaintiff's satisfactory performance dur-

---

**4.** Although there were several minor provisions which differed in the prime contract between Air Force and SBA and in the subcontract between SBA and plaintiff, provisions relevant to this case were identical in both contracts. Consequently, the two contracts will be treated as one for purposes of discussion herein.

ing the period May 1, 1982—April 30, 1983, rested on an insecure foundation. He testified that this affirmation was probably inadequate and that it resulted from time constraints placed upon him at the time. His testimony was that there was Air Force dissatisfaction with plaintiff's work performance during the May 1, 1982—April 30, 1983, period. However, the record indicates that there were only payment deductions in July 1982, which would reflect unsatisfactory work. However, an Air Force supervisor testified that the absence of more payment deductions was due to the failure of the Air Force to conduct the minimum required inspections necessary to support the deduction of payments and did not indicate that plaintiff was performing satisfactorily at all times.

The Air Force used random sampling as a way of monitoring plaintiff's work performance. Another way the Air Force monitored the performance by plaintiff of its subcontract was by way of the number of complaints lodged with various offices on Kelly Air Force Base by users of the facilities and areas serviced by plaintiff (so-called "customer complaints"). For example, for the period August 27–30, 1982, 42 customer complaints were received of which 34 were valid complaints; for the period January 21–31, 1983, 99 customer complaints were received of which 81 were valid complaints; for the period June 24–30, 1983, 55 customer complaints were received of which 35 were valid complaints; for the period September 23–30, 1983, 110 customer complaints were received of which 93 were valid complaints; for the period November 18–30, 1983, 54 customer complaints were received of which 37 were valid complaints; for the period January 27–31, 1984, 91 customer complaints were received of which 69 were valid complaints.

In February 1983, the San Antonio Air Logistics Command (ALC), Air Force Commander requested the Air Force Audit Agency to evaluate the janitorial and ser-

vice contract on Kelly Air Force Base. The reason for this request was the Commander's concern that the Air Force was not receiving the level and quality of janitorial and custodial services contracted for. The record indicates that customer complaints were the basis for the Commander's concern.

This audit report, dated September 16, 1983, concluded that the janitorial and custodial services provided Kelly Air Force Base were not satisfactory and that this resulted, in part at least, from ineffective surveillance of plaintiff's subcontract performance by the Air Force quality assurance evaluators (QAEs) (inspectors), and the lack of an approved contractor quality control program.[5] The audit report also noted that contractor discrepancy reports were not effectively processed and the acceptable quality level (AQL) used by the QAEs were too low to ensure acceptable contractor performance. In short, the report found that plaintiff's subcontract performance was not satisfactory and that the Air Force surveillance efforts were not adequate enough to detect the scope of this unsatisfactory work performance. The audit report also observed that, for reasons set forth in the report, payment deductions for deficient performance based on statistical sampling may be unenforceable because of the unreliability of the statistical sampling techniques used by the QAEs which were not deemed to be in accordance with Air Force Regulation (AFR) 400–28. On the other hand, the audit report indicated that the acceptable quality level standard used by the QAEs favored the contractor and allowed for a larger error rate before a deduction for unsatisfactory performance could be made. Finally, the audit report indicated that certain procedural steps relative to use of contractor deficiency reports had not been followed which might infect the propriety of deductions based on deficiencies covered by said reports.

---

5. The method of surveillance used by the Air Force was random sampling. For reasons cited in the report, the QAEs were unable to spend much time in selecting and evaluating contractor performance by random samples of specific tasks.

Although the Air Force had received complaints about plaintiff's performance from the inception of the April 30, 1982, contract, the Air Force apparently did not have sufficient supervisory staff to adequately monitor plaintiff's performance until the summer of 1983. In May 1983, the Air Force Group (Civil Engineer Real Property Division) mandated that building monitors be provided training on the duties and functions of QAEs. This training was incident to a new Air Force inspection program embodied in AFR 400–28 which became effective in 1981. In addition, a concerted training effort had begun in all federal installations in the San Antonio area to familiarize QAEs and Air Force customers with the requirements of the new Air Force regulations on service contracts. The training of the QAEs at Kelly Air Force Base was part of the implementation of this concerted training effort.

During the summer of 1983, building monitors at Kelly Air Force Base were being trained in the task and frequency requirements of plaintiff's janitorial services contract. As a result of this awareness of the plaintiff's responsibilities under its service subcontract, brought on by this training, the number of complaints about plaintiff's job performance increased. During the same time, the QAEs, who were directly responsible for reporting on plaintiff's job performance, began to function more effectively in monitoring said performance and this served to increase the number of deficiencies in plaintiff's job performance.

In September 1983, plaintiff's contract payments were reduced because the number of contract performance deficiencies exceeded the number allowed by the contract. In fact, plaintiff was assessed deficiencies for the period of September through February in the following amounts: September—$6,981.51, October—$17,991.34, November—$11,150.90, January—$32,167.43, February—$7,529.78. For the 5-year period preceding September 1983, a monthly deduction in excess of $1,000 occurred infrequently on plaintiff's

subcontract. On this record it is difficult to draw conclusions from the above statements. Plaintiff argues that the increased deductions suggest a concerted effort "to get" plaintiff. Defendant, on the other hand, suggests that the increased deductions resulted from increased efforts to require plaintiff to supply the services required by its subcontract.

On December 13, 1983, plaintiff submitted a claim to the contracting officer for the amounts withheld up to that point. Discussions on the matter took place between the Air Force, the SBA and plaintiff. Both plaintiff and the SBA took the position that the Air Force wrongfully withheld payments from plaintiff because the Air Force refused to provide plaintiff with information required by the contract that detailed its performance deficiencies. Negotiation between the Air Force, SBA and plaintiff continued on the Air Force's withholding of portions of plaintiff's contract payments. The contracting officer conceded in a March 27, 1984, letter that certain contract provisions were not complied with when the Air Force withheld portions of plaintiff's contract payments for performance deficiencies. No adequate resolution of this dispute had been reached up to the date of the April 13, 1984, hearing.

On January 10, 1984, Colonel Edgar Green, the Commander of the San Antonio Contracting Center, sent a letter to the District Director of the SBA. In this letter, Colonel Green announced that the Air Force did not intend to renew plaintiff's contract under the option clause of the contract. The letter also stated that the Air Force desired to use the section 8(a) program for a follow-on contract. The letter warned, however, that "this desire is predicated on the new contractor not having any affiliation with the corporate officers of, or the company of Harris Systems International, Inc." In a January 19, 1984, letter, the SBA responded and requested that the Kelly Air Force Base Custodial Contract be reserved for plaintiff.[6]

---

**6.** This letter advised that it was sent in support of a business plan submitted by plaintiff. A

Colonel Green then sent another letter to the SBA on January 27, 1984. In this letter, Colonel Green stated:

I specifically requested an 8(a) nomination other than Harris Systems International, Inc. This decision was made because of the contractor's continued failure to meet the requirements of the present contract. * * *

Harris Systems International, Inc. is unacceptable for the Kelly Project. Please suggest another responsible sub-contract or, if none is available let me know so we can advertise the project.

On February 1, 1984, the SBA replied to the Air Force's January 27th letter. In this letter, the SBA advised the Air Force that "the Small Business Administration considers Harris Systems International, Inc. an acceptable contractor for the Kelly AFB custodial contract." The letter went on to recite the fact that the Air Force failed to substantiate adequately its claim of deficient performance.

Officials of the Air Force and SBA continued to discuss the Kelly Air Force Base janitorial and custodial service matter subsequent to February 1, 1984. The Air Force was insistent that it would remain in the section 8(a) program only if a subcontractor other than plaintiff were designated by the SBA. While the SBA wanted plaintiff to be the subcontractor, it did not want to lose the $2 million dollar Kelly service procurement from the section 8(a) program. The Air Force wanted to remain in the section 8(a) program but felt the best interests of the Air Force would be served if a subcontractor other than plaintiff were designated given the performance problems it felt it was experiencing with plain-

tiff on the existing contract. In this interagency dispute there are suggestions and inferences that each is acting with ulterior motives and bad faith. The record, however, despite the personality clashes and the frustrations of a strained relationship, suggests that each was acting in good faith and motivated by what it believed to be the best interests of its constituencies. *See* n. 3, *supra,* and text.

On February 16, 1984, the SBA orally advised the Air Force that it would withdraw plaintiff's name as the SBAs designated subcontractor, which had been submitted to the Air Force by letter dated January 19, 1984, and would designate as the SBAs subcontractor, San Antonio General Maintenance. This oral designation was confirmed by letter dated February 28, 1984. In explaining the decision to designate a subcontractor other than plaintiff, an official of the SBA office in San Antonio testified in pertinent part:

Yes sir, we withdrew the name of Harris [plaintiff] and gave them [Air Force] San Antonio General Maintenance. We basically felt that the Air Force had basically convinced our District Director that Harris Systems [plaintiff] had not performed, that the deductions were valid, and that there was no way we could disprove it, so we went with another firm. * * *

The SBA, while it continues to favor plaintiff for the subcontract, is firm in its judgment that San Antonio is a capable and responsible subcontractor who is competent to perform the Kelly Air Force Base janitorial and custodial subcontract in a satisfactory manner.[7]

---

business plan had to be submitted when a contractor became a participant in the section 8(a) program. Such a plan is then updated every 2 or 3 years. The business plan generally consists of the financial and management conditions of the firm, projections of what the firm is capable of doing and what it has done and what types of services it can provide. The record suggests that it is not related to any specific RFP or procurement. In this case, the Air Force RFP for the option period May 1, 1984, had not even been issued by the Air Force as of January 19, 1984.

7. Testimony from an SBA official shows that it is not unusual for an agency to reject a subcontractor designated by SBA for agency reasons. While SBA may continue to persuade the agency to accept such a designated subcontractor, if the agency remains adamant, then the RFP in question would be taken out of the section 8(a) program and put out for competitive bids or the SBA would redesignate another section 8(a) subcontractor for agency consideration.

## II.

■ This court derives its injunctive authority in bid protest cases from 28 U.S.C. § 1491(a)(3). Section 1491(a)(3) authorizes this court "to afford complete relief on any contract claim brought before the contract is awarded. * * * " 28 U.S.C. § 1491(a)(3) (1981). It is well established that the cornerstone for this court's injunction powers under section 1491(a)(3) is the concept of an implied-in-fact contract between the government and all bidders responding to a government solicitation for bids that all bids submitted will be given fair and honest consideration. *Electro-Methods, Inc. v. United States*, 728 F.2d 1471 at 1474–1475 (Fed.Cir.1984); *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1574–1575 (Fed. Cir.1983); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983). Specifically, the implied-in-fact contract which forms the basis of this court's jurisdiction under section 1491(a)(3) is generally created when a bidder submits a responsive bid to a government solicitation. *Alabama Metal Products, Inc. v. United States*, 4 Cl.Ct. 530 at 534 (1983); *Cecile Industries, Inc. v. United States*, 2 Cl.Ct. 690 (1983); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373, 376 (1983). *See also Electro-Methods, Inc. v. United States, supra*, 728 F.2d at 1474–1475. But see *American Hoist & Derrick, Inc. v. United States*, 3 Cl.Ct. 198 (1983).

The instant case tests the parameters of the implied-in-fact basis for jurisdiction under section 1491(a)(3). Having been developed in the context of competitive solicitations, the implied-in-fact contract theory of injunctive jurisdiction is more difficult to apply when injunctive relief is sought in situations where a bid is not submitted or where the procurement process is less structured because it is designed to achieve socio-economic goals. The present case is an example of the difficulty of applying the implied-in-fact contract concept in non-bid type situations.

■ Plaintiff contends that because of the unique circumstances of the section 8(a) procurement process this court has injunc-

tive jurisdiction under section 1491(a)(3) in this case even though plaintiff here has not submitted a proposal in response to the Air Force RFP for the Kelly Custodial Contract. Plaintiff concedes, as it must, that this court has no injunctive authority relative to the Air Force's failure to exercise the second year option of the 1982 Kelly Custodial Contract. Further, the dispute over the validity of the payment deduction taken by the Air Force on the grounds of plaintiff's unsatisfactory contract performance is likewise beyond the pale of this court's injunctive authority. These matters are clearly post-award situations. See *Golden Eagle Refining Co. v. United States*, 4 Cl.Ct. 622 (1984) (Lydon, J.). Plaintiff instead focuses on the situation created by the Air Force's refusal to renew the second option year of plaintiff's 1982 Kelly Custodial Contract. Specifically, plaintiff seeks to enjoin the Air Force from conditioning its inclusion of any 1984 follow-on Kelly Custodial Contract in the section 8(a) program upon the SBA's designation of someone other than plaintiff as its subcontractor.

■ In seeking injunctive relief, plaintiff attempts to overcome the hurdle posed by the fact that plaintiff did not submit a proposal in response to the 1984 Air Force RFP by arguing that the implied-in-fact contract arose prior to the issuance by the Air Force of the 1984 RFP for the follow-on Kelly Custodial Contract. Plaintiff's basic argument is that the implied-in-fact contract for fair and honest consideration arose when the SBA submitted plaintiff's name as its designated subcontractor for any 1984 RFP by the Air Force for a follow-on Kelly Custodial Contract. Plaintiff fails, however, to define precisely how such a designation by SBA created an implied-in-fact contract. For an implied-in-fact contract to be created, there must be not only an offer, acceptance, and consideration but a mutual intent to contract by the parties. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *ATL, Inc. v. United*

*States,* 4 Cl.Ct. 672 at 675 (1984) (Miller, J.) and cases cited therein. It is important to note that this case does not involve a suspension, debarment or default termination, although plaintiff argues to the contrary. *See e.g., ATL, Inc. v. United States,* 4 Cl.Ct. 374 (1984).

In this case, the action of the SBA and the Air Force clearly demonstrates that neither intended to have the submission of plaintiff as the SBA's designated subcontractor create binding contractual obligations. At the time the SBA submitted plaintiff's name, the Air Force had neither decided to commit a follow-on Kelly Custodial Contract to the section 8(a) program nor had it issued an RFP for such a follow-on contract. Further, there was nothing to prevent the Air Force from deciding to perform the services in question in-house, as it once did before it entered into the section 8(a) program. Moreover, when the SBA met resistance from the Air Force, it withdrew plaintiff's name and submitted that of San Antonio General Maintenance. Indeed, testimony by an SBA official that there have been other instances in which the SBA has withdrawn the originally designated subcontractor and substituted a new one pursuant to the request of an agency (*see* n. 7, *infra*) suggests rather strongly that designation of a subcontractor is not a binding and irrevocable act. Rather, the record indicates it is a negotiable item between two parties. In fact, the reason the SBA withdrew plaintiff's name as its designated subcontractor was that it became convinced at that time that the Air Force's dissatisfaction with plaintiff's performance record on the 1982 Kelly Custodial Contract was supportable.

The dealings between the SBA and the Air Force concerning the designation of plaintiff as 8(a) contractor for a follow-on Kelly Custodial Contract were the normal "give and take" between coequal agencies of government. Neither party intended these preliminary actions to create any implied contractual rights for plaintiff. In fact, the SBA did not specifically inform plaintiff when it submitted plaintiff's name to the Air Force for a follow-on Kelly Custodial Contract. Nor was plaintiff specifically apprised by the SBA of the dealings and developments between the SBA and the Air Force concerning a potential 1984 Kelly Custodial Contract RFP.

During this period of January 10, 1983, to February 28, 1983, both the SBA and the Air Force were simply exchanging information relative to Air Force reaching a decision concerning the continued use of the section 8(a) program for procurement of janitorial and custodial services at Kelly AFB. In fact, the regulations governing procurement through the section 8(a) program direct the contracting agency (the Air Force) to evaluate the qualifications and capabilities of a designated subcontractor before making a decision on whether to commit to the section 8(a) program. 48 Fed.Reg. 42,255 (Sept. 19, 1983) to be codified at 48 C.F.R. § 19.804 (1984). *See also* 32 C.F.R. § 705.5(B) (1983).[8] Moreover, the current regulations suggest that the contracting agency should exchange information with the SBA even prior to the SBAs designation of a subcontractor in order that a satisfactory decision may be reached by both parties, regarding participation in the section 8(a) program. 48 Fed.Reg. 42,255 (Sept. 19, 1983) to be codified at 48 C.F.R. § 19.803 (1984). Specifically, the regulations state: "Through their cooperative efforts, the SBA and an agency match the agency's requirements with the capabilities of 8(a) concerns to establish a basis for an agency to contract with the SBA under the program." *Id.* at § 19.803(a). In this case, the Air Force notified the SBA of its dissatisfaction with plaintiff and its inability to work with plaintiff in order that both it and the SBA could come to an agreement on the use of the section 8(a) program for a follow-on Kelly Custodial Contract.

---

**8.** Section 19.804(a)(3) states in part: "In determining the extent to which it can honor a request for a commitment to support a business plan, the agency should evaluate * * * [p]rob- lems encountered in previous acquisitions of the item or work from the SBA's contractor * * *." 48 Fed.Reg. 42,255 (Sept. 19, 1983) to be codified at 48 C.F.R. § 19.804(a)(3) (1984).

■ Both the facts in this case and the regulations cited above, support the conclusion that the SBA and the Air Force were involved in preliminary dealings with no intention of creating any binding contractual rights. Both the SBA's actions and those of the Air Force remained preliminary and non-binding until such time as the Air Force actually issued a RFP for the follow-on Kelly Custodial Contract and the SBA, in turn, submitted its subcontractor's proposal which directly addresses the requirements of the RFP. It is at this point in this case that an implied-in-fact contract would have been reached. It is at this point that Air Force would have been committed to fairly and honestly negotiate with the contractor designated by the SBA. Such a point was never reached in the present case; consequently, no implied-in-fact contract ever existed between the Air Force and plaintiff in this case. Therefore, on the particular facts of the case, it is concluded that this court has no jurisdiction under 28 U.S.C. § 1941(a)(3) to exercise injunctive authority as requested by plaintiff.

### III.

Although as discussed above, the court has determined that it has no jurisdiction over plaintiff's claim, the court deems it prudent to discuss the merits of plaintiff's claim. The court takes this step because of the complexity and uncertainty of the jurisdictional issue, the fact that a full trial on the merits has already been held in this case and a desire to avoid, if possible, a remand if an appeal is taken. *See, e.g., F. Alderete General Contractors Co. v. United States,* 715 F.2d 1476 (Fed.Cir.1983).

■ In order to determine whether plaintiff qualifies for injunctive relief, the court must consider three factors: (1) the merits of the dispute; (2) the possibility of plaintiff suffering irreparable harm absent injunctive relief including consideration of whether plaintiff has an adequate remedy

at law; and (3) the public interest. As discussed below, the application of these three factors demonstrate that plaintiff is not entitled to injunctive relief. *Golden Eagle Refining Co. v. United States,* 4 Cl.Ct. 613 at 620 (1984) (Lydon J.). *Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613, 616 (1983).

### 1. The Merits.

■ The essence of plaintiff's claim is that the Air Force wrongfully and in bad faith pressured the SBA into designating a section 8(a) contractor other than plaintiff as the SBA's subcontractor on the follow-on Kelly Custodial Contract by threatening to withdraw from the section 8(a) program if plaintiff was so designated.[9] Plaintiff alleges that this undue influence by the Air Force on the SBA to preclude plaintiff from being the SBAs designated subcontractor had no reasonable and rational basis and was motivated by a bad faith effort to harm plaintiff. Since, in plaintiff's view, the Air Force's attempt to preclude plaintiff from being designated as SBAs subcontractor as to the follow-on contract was made in bad faith, Air Force's threat to withdraw the follow-on Kelly Custodial Contract from the section 8(a) program if the SBA designated plaintiff must also be deemed to be tainted with bad faith.

■ Any examination of plaintiff's allegations concerning the Air Force's action must begin with the presumption that public officials act conscientiously and in good faith in the discharge of their duties. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978); *Librach v. United States,* 147 Ct.Cl. 605, 612 (1959). Moreover, it takes "well-nigh irrefragable proof" in order to overcome this presumption of good faith. *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301–1302 (1976); *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954). Plaintiff concedes that he must

---

**9.** As indicated previously, the Air Force, by statute, has discretion relative to participation in the section 8(a) program. *See* n. 3, *supra.* The court finds no abuse of the threatened exercise

of this discretion by Air Force on this record. *See Serman R. Smoot Co. v. United States Dep't of Transp.,* 516 F.Supp. 260, 263, 264 (D.D.C. 1981).

overcome this presumption, but contends that the evidence presented to the court constitutes such "irrefragable proof."

In order to prove the lack of rationality and bad faith by the Air Force, plaintiff must show that the Air Force was "motivated alone by malice," that its actions were specifically calculated to injure plaintiff and that its action lacked a rational and reasonable basis. *Gadsden v. United States*, 111 Ct.Cl. 487, 489, 78 F.Supp. 126 (1948). *See Kalvar Corp. v. United States, supra,* at 211 Ct.Cl. 197–199, 543 F.2d 1301–1302; *F. Alderette General Contractors, Inc. v. United States*, 4 Cl.Ct. 482 at 492 (1984) (Merow, J). Plaintiff points to the Air Force's deductions for deficient performance which began in September 1983 and contends that the Air Force's action relative to these deductions prove that the Air Force was "out to get" plaintiff. Furthermore, plaintiff contends that the Air Force's action relative to plaintiff's status as SBAs designated subcontractor was motivated by the same bad faith that motivated the contract payment deductions in the period following September 1, 1983.

The testimony and exhibits submitted by both parties at trial disclose that although the Air Force had an inadequate inspection system, it was not in any manner motivated by a desire to use that inspection system to injure plaintiff maliciously. The record indicates that during the Spring and Summer of 1983, the Air Force personnel administering the Kelly Custodial Contract received numerous complaints about plaintiff's performance of its janitorial and custodial duties. In fact, dissatisfaction with plaintiff's performance was so high that the maintenance department at Kelly AFB asked the Audit Division of the Air Force to conduct an audit of the contract. While it is true that plaintiff had not been subject to many deductions prior to September 1983, this does not indicate customer satisfaction but merely the Air Force's inability to perform the number of inspections necessary to make such deductions. In addition, the fact that person-nel on the base were given training in the Spring and Summer of 1983 on the proper method of filing customer complaints indicates an attempt by the Air Force to gauge accurately the services being provided. This training in customer complaint procedure does not indicate the Air Force's attempt "to get" plaintiff. Rather, it indicates a desire to ensure that the Air Force received the services it was paying plaintiff to perform under the subcontract.

Plaintiff also points to the Air Force's failure to provide plaintiff with so-called Contract Performance Evaluation Reports (CPER) for the period involving deductions as further evidence of bad faith. Plaintiff asserts that these CPERs were required by the contract. The record discloses, that although the CPERs were required by the 1982 Kelly Custodial Contract, the provision in the 1982 contract was derived from an old Air Force regulation concerning contract inspection, AFR 70–9. The Air Force began to use a new regulation dealing with contract inspections subsequent to the time the old AFR 70–9 was included in the 1982 contract. This regulation was AFR 400–28 and under this regulation CPERs were not required to be given to the contractor. In essence, the Air Force was utilizing the new regulation, which did not require CPERs, although the contract was based on an old regulation which required use of CPERs. The error in this regard, if such it is, was not based on bad faith but on poor contract administration. Further, this procedural violation while it may serve to preclude payment deductions does not *per se* obviate the fact that unsatisfactory service was rendered.

While Air Force personnel believed, in good faith, that the CPERs were not required to be given to the contractor, the record discloses that these supervisory personnel made efforts to ensure that plaintiff received notification of the areas and the reasons for deficiencies. Specifically, the SBA supervising representative was notified orally of any performance deficiencies found by the QAEs on the same day that these deficiencies were found. When plain-

tiff requested the actual inspection worksheets used by the QAEs, the Air Force waited to get clearance from its legal staff to release these documents. However, during this waiting period the Air Force contract administrator provided plaintiff with a handwritten list of the actual deficiencies found by the QAEs during the period in question.

Plaintiff also relies on the fact that the Air Force used improper inspection techniques to supervise plaintiff's contract performance. Furthermore, plaintiff asserts that the Air Force had notice of the faults in its inspection system because of criticism of these techniques in the 1983 audit report. Plaintiff further points to the fact that Air Force legal staff informed the Air Force personnel supervising this contract that "technical prerequisites" were not followed by the Air Force when it assessed the performance deficiencies against plaintiff. All these factors plus the fact that the Air Force has not repaid plaintiff the amount deducted for performance deficiencies are presented by plaintiff as evidence of bad faith.

After consideration of all the conflicting and sometimes confusing testimony and evidence offered, the court is of the view that defendant's inspection techniques did indeed suffer flaws. The lack of sufficient sample size for random sampling, the lack of a sufficient breakdown of tasks required within the job categories, and the requirement that all categories receive a passing grade in order for a whole building area to pass inspections constituted defects in the inspection procedure. Some of these deficiencies helped plaintiff, others hurt plaintiff. The court is convinced, however, that these defects were the result of the difficulty in devising an adequate inspection system for a large and complex Industrial area like the one at Kelly Air Force Base.

Although the Air Force would have been well advised to have revamped its inspection procedures after the 1983 audit report, its continued use of these procedures certainly does not indicate a malicious attempt to injure plaintiff. It indicates, at best, the slow pace at which the Air Force bureaucracy operates.

Moreover, it must be remembered that plaintiff also bears some responsibility for quality control problems on this contract. After all, if it had performed its subcontract with proficiency in all respects there would have been far fewer deficiencies to report. However, the record discloses numerous customer complaints about plaintiff's performance during the period in question. Furthermore, plaintiff's failure to have an approved quality control program contributed to these problems and to its inability to respond effectively when deficiencies began to be deducted. It had some obligation to minimize performance deficiencies to eliminate any contract payment deductions. Plaintiff had no right to rely on the Air Force to perform quality control on its performance that it should have been performing on itself. The record does not indicate what efforts, if any, plaintiff made to ensure that it was fully performing the services required of its subcontract in a satisfactory manner.

Considering all the facts and circumstances of this case, it is clear that the Air Force made mistakes in judgment and used less than perfect inspection techniques in administering the subcontract. The Air Force's inspection procedure and its supervision of plaintiff's contract performance were, however, motivated by a desire to ensure that plaintiff adequately performed the janitorial and custodial services required by the contract, not by a malicious intent to injure plaintiff.[10]

10. The court's view that both parties must bear responsibility for the problems surrounding performance of the subcontract during the period in question is supported by the deposition testimony of the SBA District Director in San Antonio who felt there was guilt on both sides (the Air Force and the contractor) in this matter and

believed the matter should have been compromised and settled. The SBA Director felt that personalities played an important role in the performance-inspection-deductions dispute between the parties, that the involved parties each took harsh positions, and, since all wanted to save face, none were willing to compromise.

When the Air Force informed the SBA in January 1984 that the continuance of the Kelly Custodial Contract was conditioned on the SBA designating someone other than plaintiff as its subcontractor, the Air Force was merely attempting to avoid future problems in the performance of custodial and janitorial services at Kelly Air Force Base. Given its dissatisfaction with plaintiff's performance on the 1982 Kelly Custodial Contract and the problems which surrounded that contract, defendant had a rational and good faith reason for conditioning its use of the section 8(a) program on the designation of someone other than plaintiff as SBA's subcontractor for a follow-on contract.

One final matter deserves mention. In the dealings between the Air Force and the SBA, the negotiations were not one-sided. Each was a powerful agency capable and competent of protecting its turf and standing up for what it believed to be the best interests of its agency and its programs. It is unreasonable on this record to view the SBA as threatened or intimidated by the Air Force. In withdrawing its initial submission of plaintiff's name as a possible subcontractor for the May 1, 1984, service contract and designating another subcontractor as the SBA's choice, the SBA made a determination, that it knew only it could make, which reflected a reasoned judgment given the variety of alternatives opened to it. The court doubts that the SBA was afraid to take on the Air Force if it felt that was the prudent and responsible thing to do under the circumstances.

### 2. Irreparable Injury

Plaintiff alleges that if it is not allowed to be considered for the follow-on Kelly Custodial Contract under the section 8(a) program, its business will be irreparably harmed. Specifically, plaintiff contends that Kelly Custodial Contract accounts for 60 percent of its business and that the loss of this business will have a "crippling effect" and result in the layoff of at least the 100–125 employees currently employed on the Kelly Custodial Contract.

■ Plaintiff's assertions of irreparable harm are unconvincing, however. Although plaintiff will undoubtedly suffer some economic loss as a result of its failure to be the SBAs designated subcontractor on the follow-on Kelly Custodial Contract, its loss will not be such that it will suffer irreparable harm so as to entitle it to injunctive relief. Plaintiff currently is performing three other government custodial and janitorial contracts. These three other contracts were obtained through competitive bidding and not through the section 8(a) program. In fact, plaintiff's company predates the section 8(a) by almost 30 years, suggesting that plaintiff's business can survive in a freely competitive environment. Moreover, plaintiff has enjoyed considerable benefits from the section 8(a) program for over 11 years; 11 years certainly seems a sufficient period to prepare plaintiff to succeed in the custodial and janitorial service business without the support of the section 8(a) program even given the contract payment deductions plaintiff suffered after September, 1983.[11]

Additionally, the loss of the Kelly Custodial Contract after April 30, 1984, was an event plaintiff could clearly have foreseen and planned for. As plaintiff concedes, the Air Force had a unilateral right not to exercise the option of the Kelly Custodial Contract. Consequently, plaintiff could not

The record in this case supports these observations and the court's unsuccessful effort to effect a compromise is a sad commentary on the hard-headed and partisan, intractability of the parties, particularly the Air Force.

11. In 1981, as a result of some concern over excessively long tenure by some businesses in the section 8(a) program, the SBA, by regulation, limited the number of years a business could be in the section 8(a) program. The limit was for 5 years, with businesses eligible to apply to the SBA for a 1 or 2 year extension. *See* 32 C.F.R. § 124.1–1(f) (1982). As a result, under existing law, a small business can be in the section 8(a) contract program no longer than 7 years. Indeed, plaintiff, as part of the SBA's Fixed Program Participation Term (FPPT), is scheduled to complete (graduate if you will) participation in the section 8(a) contract program in December 1984.

reasonably have counted on having the Kelly Custodial Contract beyond April 30, 1984. It certainly cannot now complain that its failure to have or be considered for the contract beyond April 30, 1984, will result in irreparable harm. *See Golden Eagle Refining Co. v. United States*, 4 Ct.Cl. 613 at 620–621 (1984) (Lydon, J.).

Plaintiff has a remedy at law for any wrongful failure by the Air Force to exercise the second year option of the 1982 Kelly Custodial Contract. Since the Air Force's failure was not an issue in this case, the court makes no determination concerning the failure to exercise that option. In the event, plaintiff should prevail in an action based upon the failure of the Air Force to exercise the option, plaintiff can recover damages for the Air Force's breach. Plaintiff also has a remedy at law for any erroneous payment deductions, which figured so prominently in the record and the submissions of plaintiff in this case.

### 3. Public Interest.

In this case the public interest weighs against court interference in the interaction between the SBA and the Air Force. As discussed earlier, stripped to its essentials this case involves the relationship between two coequal government agencies. Plaintiff wants the court to preclude the Air Force from exerting any influence on the SBA relative to the SBAs designation of a subcontractor for the follow-on Kelly Custodial Contract. It is, however, in the public interest to allow the two agencies to deal with each other free from court interference. By leaving the two agencies alone, the two agencies are free to resolve their differences by compromise, rather than by a court imposed solution. Since no element of bad faith exists in the case, the agencies should be free to resolve any differences they have themselves.

As the discussion above demonstrates, plaintiff cannot satisfy the factors necessary for the granting of injunctive relief. Moreover, the circumstances of this case do not involve matters of such urgency and import that an extraordinary remedy is called for. It is well settled that the grant of injunctive relief is an extraordinary remedy and should be exercised by this court in extremely limited circumstances. *See CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983); *United States v. John C. Grimberg Co. Inc.*, 702 F.2d 1362, 1372 (Fed.Cir.1983) (*en banc*). Thus, even if this court had jurisdiction over the plaintiff's claim, plaintiff would not be entitled to injunctive relief.

### IV.

For the reasons discussed above, plaintiff's request for injunctive relief is denied and plaintiff's verified complaint is to be dismissed.