**KALVAR CORPORATION, INC.**

v.

**The UNITED STATES.**

No. 249–75.

United States Court of Claims.

Oct. 20, 1976.

Valentine B. Deale, Washington, D.C., attorney for plaintiff.

Richard J. Webber, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and SKELTON, Judge.

### ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This case is before the court following the court's order of June 8, 1976, directing the parties to file supplemental briefs to assist us in deciding whether the matter in dispute may be disposed of on the pending motions for summary judgment, or should be remanded for trial.

Plaintiff Kalvar Corporation was granted a "primary source of supply" contract to provide the General Services Administration (GSA) with its 1973 requirements of film having a speed rating between 1.05 and 1.45. As acknowledged under the contract, the precise extent of the GSA requirements was to be determined by orders placed by various Government agencies through the Federal Supply Schedules.

On October 19, 1972, the Internal Revenue Service requested the GSA to supply film to meet special needs of the IRS for fiscal year 1973; specifically, the IRS sought Kalvar's M–200 film, and HS–66 film to be supplied by the Xidex Corporation. (Xidex had been a primary source supplier to GSA in the year preceding Kalvar's contract.) The GSA determined, on the basis of information supplied by Kalvar and Xidex regarding their own films, that the films requested by the IRS were beyond the scope of Kalvar's primary source contract. Kalvar contracted to supply one thickness of its M–200 film in an amendment to its original contract, and Xidex entered into an additional contract with GSA to supply three thicknesses of its H–66 film.

In December 1972, Kalvar notified GSA that it disputed the additional contract with Xidex and withdrew its prior offer to supply the M–200 film. Kalvar had tested Xidex' HS–66 film and claimed it to be within the specifications of Kalvar's original primary source contract. It then became Kalvar's contention that all GSA requirements, including the special order of the IRS, could be satisfied from Kalvar's original contract, and consequently that the GSA had breached its primary source contract by not limiting its supply to Kalvar. The GSA rejected Kalvar's contention in administrative negotiations as did the Comptroller General upon subsequent appeal. Plaintiff then commenced a breach of contract action in this court.

At oral argument, plaintiff's breach suit was apparently foreclosed by defendant's showing that it had discovered, after the briefs had been filed, that the contract incorporated standard provisions which, under the court's decision in *John Reiner & Co. v. United States*, 325 F.2d 438, 163 Ct.Cl. 381 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), effectively convert any breach to a termination

for convenience by the Government. On June 8, 1976, the court issued an order wherein we specifically found that such a termination-for-convenience clause was a part of the contract and requested the parties to submit supplemental briefs to determine: (1) whether defendant had evinced bad faith or a clear abuse of discretion in its actions; and (2) whether plaintiff has incurred any costs that are recoverable under the termination-for-convenience clause.

After consideration of the supplemental briefs of the parties, as well as their briefs in cross-motions for summary judgment, we find that plaintiff has failed to make a sufficient showing of bad faith or abuse of discretion by the Government. The assertions which plaintiff sets forth in its supplemental brief were all presented at oral argument and were denied by the court's order of June 8, 1976. Even if the order is disregarded and we examine each of the claims against the facts of record, we find that plaintiff has not made a sufficient showing of Governmental bad faith or abuse of discretion to raise a triable issue.

As to plaintiff's claims for recoverable costs incidental to a termination for convenience, we deny all of the specified claims as being outside the scope of the termination clause. However, we remand the case to the trial judge for a determination of the reasonable value of the legal services rendered by plaintiff's attorney in the preparation of its supplemental brief to the court.

## I.  Plaintiff's Claim of Governmental Bad Faith

Kalvar would infer Governmental bad faith from the "egregious nature" of the alleged contract violation, from a "pattern of uneven, discriminatory administration" against it and in favor of Xidex, and from an alleged "willful indifference" to Government regulations. Kalvar makes no conceptual distinction between "bad faith" and

"abuse of discretion" and, for the purposes of this decision, we accept Kalvar's equation of the two concepts.[1] To support its claims of bad faith, Kalvar presents six specific "illustrations" of GSA's "clear abuse of discretion." These six illustrations center upon four specific acts of the GSA:

A.  That GSA "deliberately withheld" information from Kalvar regarding the IRS' special requirement for film and failed to give it the first opportunity to meet the special requirement under the primary source contract.

B.  That GSA applied a double standard of treatment when it sought out Xidex in 1973 for supplies of the IRS-requested film, since in 1972 GSA had refused an offer by Kalvar to supply "out of spec" film while Xidex held the primary source contract.

C.  That GSA made a "wholly arbitrary finding" that Xidex' HS–66 film was beyond the specifications of Kalvar's primary source contract, based only on Xidex' representations and without confirmatory testing.

D.  That although GSA made no distinction between Kalvar and Xidex film when it requested that the two companies' films be placed on the supply schedule, it contracted with Xidex for supply of film in three thicknesses, but contracted with Kalvar for supply of only one thickness.

## II.  The Merits of Kalvar's Claims of Bad Faith and Abuse of Discretion

■ Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act "conscientiously in the discharge of their duties." *Librach v. United States,* 147 Ct.Cl. 605, 612 (1959). The court has always been "loath to find to the contrary," and it requires "well-nigh irrefragable proof" to

---

1. We need not decide whether bad faith is tantamount to abuse of discretion, since in our view plaintiff's claims indicate neither was present here. However, many of our prior decisions seem implicitly to accept the equivalence of bad faith, abuse of discretion, and

gross error. *See Librach v. United States,* 147 Ct.Cl. 605, 614 (1959); *Levering & Garrigues Co. v. United States,* 71 Ct.Cl. 739 (1931); *see also* J. McBride & I. Wachtel, *Government Contracts* § 5.60[1] (1965).

induce the court to abandon the presumption of good faith dealing. *Knotts v. United States,* 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954).

In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some *specific intent to injure the plaintiff.* Thus, in *Gadsden v. United States,* 78 F.Supp. 126, 127, 111 Ct.Cl. 487, 489–90 (1948), the court compared bad faith to actions which are "motivated alone by malice." In *Knotts, supra,* at 128 Ct.Cl. 500, 121 F.Supp. 636, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy * * * to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 222 (1942) found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach, supra,* at 147 Ct.Cl. 614, the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

■ The mere fact that a contracting officer awards a contract to another company after terminating the plaintiff's contract is insufficient to show bad faith. As the court declared in *Colonial Metals Co. v. United States,* 494 F.2d 1355, 1361, 204 Ct.Cl. 320, 331 (1974):

> * * * that the contracting officer knew of the better price elsewhere when he awarded the contract to plaintiff—in the absence of some proof of *malice or conspiracy against the plaintiff* (*cf. Librach v. United States,* 147 Ct.Cl. 605, 612–14 (1959))—means only that the contract was awarded improvidently and does not narrow the right to terminate. [Textual emphasis added.]

■ In view of the high standard of proof required to show bad faith (tantamount to a showing of malice or conspiracy), the plaintiff here fails to make its case for two reasons. First, the plaintiff's four specific allegations of bad faith were made in the briefs or at oral argument, and thus have been decided by the court's June 8, 1976 order. The court stated in its order that "it does not agree that the facts shown in the record * * * would enable the court to determine that the defendant was guilty of bad faith * * *." Since there are no new claims of bad faith, and no new evidence beyond plaintiff's vague offer to produce "testimony by cognizant personnel of plaintiff" (*see, e. g.,* Plaintiff's Supplemental Brief, p. 4), the court may justifiably deny plaintiff's motion.

■ Second, even if it is assumed that the court's June 8, 1976 order did not finally dispose of plaintiff's arguments, a close examination of these contentions in the light of the available facts discerns no support for a finding of bad faith or abuse of discretion. Plaintiff's first charge is that the GSA had an obligation to disclose to it, as primary source supplier, the IRS special request before seeking new contracts. But as defendant pointed out in its moving brief, the Comptroller General ruled that the GSA had no such duty under the primary source contract. Even if defendant's and the Comptroller General's interpretations of the contract were incorrect, an incorrect reading of the contract by Government officials is not tantamount to malice or bad faith. *Nolan Bros. Inc. v. United States,* 405 F.2d 1250, 1253, 186 Ct.Cl. 602, 606 (1969).

■ Plaintiff's second charge of bad faith is that in 1972 the GSA had rejected Kalvar's offer to provide film beyond the specifications of Xidex' then primary source contract, but in 1973 GSA accepted Xidex' offer to provide film beyond the specifications of Kalvar's primary source contract. However, in appendix "W" to plaintiff's cross-motion for summary judgment, it is stated that the GSA rejected Kalvar's 1972 offer precisely because GSA believed the offered film to be *within* the scope of Xidex' primary source contract. Thus, GSA's actions in 1973 were not inconsistent with its actions in 1972. It felt that the film offered by Kalvar in 1972 was within the "spec" of Xidex' contract, and thus not purchasable, whereas GSA decided that Xidex' film offered in 1973 was "out of spec" and

purchasable (this determination by GSA was upheld by the Comptroller General; *see* Plaintiff's Appendix "X"). If GSA's determination was erroneous, it nevertheless does not rise to the level of an action taken in bad faith.

Plaintiff's third argument is that GSA made a wholly arbitrary finding that Xidex film (HS–66) was beyond Kalvar's 1973 contract, relying solely upon Xidex' representation and without testing the film independently. However, it is undisputed that GSA, had always relied upon the manufacturers' representations regarding the specifications of their films, because GSA had no testing equipment of its own. In this instance, GSA accepted a statement made by Xidex as to the speed rating of its HS–66 film. After the speed rating was challenged by plaintiff, GSA obtained a confirmation of the statement previously made by Xidex, believing that Xidex had made a rating upon the basis of good faith testing. Plaintiff may well argue that GSA's practice was unwise in this regard and indeed the manufacturers agreed to and GSA later adopted a new testing procedure, which came too late to affect plaintiff's contract. However, even if GSA's reliance upon information furnished by Xidex was misguided or if the information was erroneous, neither of these is sufficient to show bad faith.

Plaintiff's final allegation is that GSA contracted for only one thickness of the special new film from Kalvar but contracted for three thicknesses from Xidex, and that this different treatment is indicative of prejudice toward Kalvar. But the reason for the GSA action, as the record reveals, is that Kalvar offered to supply only one thickness of the film, whereas Xidex offered three. Certainly no Governmental bad faith can be inferred from treatment which resulted from plaintiff's own offers.

In summary, we hold that Kalvar has made an insufficient showing of malicious intent or "animus" toward it in order to avoid the limitations of the termination-for-convenience clause. Mere error on the part of the Government, even if it would consti-

tute sufficient ground for contractual breach were the termination clause inapplicable, is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience. *Librach, supra,* at 614.

### III. *Plaintiff's Claims for Cost Reimbursement*

The remaining question before us is whether, under the termination-for-convenience clause, plaintiff is entitled to the costs which it now asserts to be reimbursable. Kalvar asserts five general categories of such costs in its brief:

A. The difference between the price of film under the Government contract and the price Kalvar obtained when it subsequently sold the "terminated inventory" to other private buyers. Asserted Cost: $13,555.

B. Costs of financing plaintiff's inventory which had been prepared for meeting anticipated contract demands for film. Asserted Costs: $17,250 (18 percent of plaintiff's "average investment in inventory during the period of defendant's breach").

C. An "equitable adjustment" to compensate plaintiff for higher unit costs in its subsequent sales to the Government, brought about by lower production runs for the Government's decreased demand. Asserted Costs: $35,738.

D. Administrative, quality control and testing expenses associated with the alleged breach of contract. Asserted Costs: $3,250.

E. Legal fees incurred in administrative negotiations over the original breach of contract claims, before filing suit in this court. Asserted Costs: $14,925.

At least three of plaintiff's asserted costs (claims A, B and C) are not recoverable because they clearly pertain only to anticipatory profits, which are barred by the termination-for-convenience clause. *Colonial Metals Co. v. United States, supra,* at 494 F.2d 1362, 204 Ct.Cl. 332–33. That plaintiff seeks anticipatory profits is per-

haps most evident in claim A, wherein plaintiff claims the difference between the price of film under the Government contract and the price under subsequent private contracts.

Normally upon termination, a contractor is entitled to the difference between the cost of materials purchased to perform the contract and their market price at the time of termination. *Baker Food Products Corp. v. United States,* 75 Ct.Cl. 591, 596 (1932). This rule applies only to the loss which a contractor would suffer upon resale. It is obviously inapplicable where, as here, the contractor makes some profit upon "covering" the goods. Clearly, when a contractor seeks the difference between the prices he obtained in a profitable "covering" sale and the prices he would have obtained under the terminated contract, he *is in effect demanding anticipatory profits.* Indeed, plaintiff in its petition labeled this claim as one for "lost profits." (Plaintiff's Petition, p. 10, para. 25.)

Similarly, Kalvar's claim B seeks compensation for "financing costs" of the inventory it had prepared in anticipation of the Government's requirements under the primary source contract. Plaintiff carefully avoids claiming reimbursement for the costs of the inventory and supplies themselves, since those costs are expressly disallowed by 41 C.F.R. § 1–8.701(e)(2)(i).

What plaintiff fails to note is that the termination-for-convenience clause, 41 C.F.R. § 1–8.701(f) also incorporates by reference subpart 1–15.2 of the Federal Procurement Regulations. Among the provisions of that subpart, section 1–15.205–17 specifically prohibits "[i]nterest on borrowings (however represented), bond discounts, *costs of financing or refinancing operations* * * *."* Thus even if the cost of the inventory and supplies were allowable, the interest cost of financing those inventory and supplies may not be reimbursed.[2]

Plaintiff's claim C is for reimbursement for the "higher unit costs" which followed the reductions in Kalvar's Government sales (plaintiff was able to sell only a reduced quantity to other purchasers). Again, this claim looks to the unit costs Kalvar *would have enjoyed* had its original contract been continued. Thus the claim seeks consequential damages and also involves anticipatory earnings. Moreover, the claim overlooks the fact that the original primary source contract was not for a fixed supply, but rather was a "requirements" contract, which could in good faith be terminated as soon as the Government's requirements ceased. Kalvar assumed the risk of any premature termination when it entered into the contract.

The remainder of Kalvar's asserted costs (items D and E) are claims which on their face seek reimbursement for costs related to the alleged breach rather than to the termination itself. The theory underlying this position is Kalvar's belief that since breach is equated to termination for recovery purposes, "equity would seem to require" that expenses associated with breach at the administrative level "be on a parity" with expenses associated with termination.

Plaintiff's theory misconstrues the law in the area of constructive termination for convenience. In *John Reiner & Co. v. United States, supra,* 325 F.2d at 442–43, 163 Ct.Cl. at 390–91, this court first applied the constructive termination-for-convenience doctrine in a case where the contracting officer had not actually invoked the clause in administering the contract. In the absence of bad faith or clear abuse of discretion, the effect of the constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause. *Nolan Bros., Inc., supra,* at 405 F.2d 1254–55, 186 Ct.Cl. 608–10. Thus, although the Government has contested all of Kal-

---

**2.** If the prohibition on interest were not applicable here, it is still difficult to perceive plaintiff's argument that interest is reimbursable. The financing costs for the inventory are even-

tually paid by the sale of the inventory, and thus would appear to be a direct "cost of supplies," which plaintiff has already recognized as not being allowable.

var's breach claims, we need not consider the merits of any claim for breach of contract here. Any award of damages must be limited to items specifically allowed by the termination clause.

■ It follows that Kalvar's claim D, for reimbursement of administrative and other expenses associated with the alleged breach, may not be granted in this case because the allowance of such costs would in effect permit recovery of some of the underlying breach claims. This would render the termination procedure meaningless. The termination-for-convenience clause, 41 C.F.R. § 1–8.701 limits recovery to: (a) completed supplies accepted by the Government, (b) costs of performance of terminated work, and (c) costs of settling and paying claims arising out of the termination. 41 C.F.R. § 1–8.701(e)(1–3). Although the expenses sought in claim D are administrative, and in that sense resemble costs of settling and paying claims under (c) above, they do not arise out of the "termination," but rather out of an alleged breach. Hence they may not be recovered here.

Plaintiff's claim E, for legal fees involved in the assertion of breach claims, presents a more difficult and novel problem. Under the preceding analysis, plaintiff may not of course recover legal fees associated purely with the breach claims. However, we must decide whether Kalvar may recover legal expenses that should properly be considered as settlement expenses in a termination for convenience by the Government.

The termination-for-convenience clause, 41 C.F.R. § 1–8.701(e)(3), explicitly allows "reasonable costs of settlement, including * * * legal * * * expenses reasonably necessary for the preparation of settlement claims." Normally these expenses would arise at the administrative level, in negotiation following the contracting officer's termination order. Here, however, the termination is constructive, by imposition of the court, and hence plaintiff had no opportunity to engage in settlement negotiations at the administrative level. In essence, plaintiff's legal expenses in preparation for settlement were incurred when it filed its

supplemental brief pursuant to the court's order that it prepare "a statement as to whether plaintiff incurred any costs that are recoverable under the termination-for-convenience clause * * *."

We are well aware that section 2412 of title 28 of the U.S. Code prohibits the court from awarding attorney's fees in "any civil action brought by or against the United States * * *." However, we view the principles of the statute to be inapplicable to costs which, had proper procedures been followed, would naturally have arisen in the process of settlement rather than in a court action brought against the United States. Section 2412 is expressly limited to "civil actions," and thus applies only to adversary proceedings in the process of litigating actual disputes. Here, the claim for attorney's fees arose after litigation began, but it is distinctly separate from the underlying breach claims asserted by plaintiff. Rather than being a proper part of the civil action, attorney's fees that pertain to the procedure of a negotiated settlement are unrelated to the assertion of disputed contract rights.

■ In determining the allowability of a contractor's claim for attorney's fees, it is the nature and form of the legal activities, rather than the time when costs for the legal services were incurred, which provide the proper focus of inquiry. Thus, in *Acme Process Equipment Co. v. United States*, 347 F.2d 538, 171 Ct.Cl. 251 (1965), this court allowed legal fees incurred in an unsuccessful termination settlement even though the fees were for work performed after the plaintiff had filed an administrative appeal.

The distinction recognized in *Acme Process* is consistent with the position espoused by the Boards of Contract Appeals. Although the Boards frequently note the prohibition against attorney's fees and refuse to reimburse the contractor for costs not specifically permitted by contract provisions, they will allow legal fees "to the extent reasonably necessary for the preparation and presentation of settlement proposals * * *." *Reed & Prince Mfg. Co.*,

ASBCA 3172, 59–1 BCA 2172 at 9484 (1959). *See also, Appeal of Grumman Aerospace Corp.,* NASA BCA 87311, 76–1 BCA 11763 (1976).

As previously noted, the constructive termination for convenience is a legal fiction which imposes the standard limitations of the termination clause upon a plaintiff even though the termination was never actually ordered by the contracting officer. The court in such a case proceeds as if the termination had in fact been ordered. Since the constructive termination for convenience limits the contractor to those claims he would have incurred had there been an actual termination, it is only fair to allow the contractor the equivalent of the legal expenses he would have incurred in preparing a settlement claim after actual termination. In this case, these are the costs Kalvar has incurred as a result of the court's order. Admittedly, our allowance of legal expenses in this case rests upon a liberal reading of the termination clause and upon an analogy drawn between termination costs in administrative proceedings and similar costs resulting from a court-imposed convenience termination. The use of such an analogy has been specifically approved by this court for solving the uncertain and difficult questions that arise in constructive termination-for-convenience cases. *Inland Container Co. v. United States,* 512 F.2d 1073, 1081, 206 Ct.Cl. 478, 493 (1975).

The only costs which plaintiff is entitled to recover as "legal expenses reasonably necessary for the preparation of settlement claims" are the reasonable attorney's fees which plaintiff incurred in the preparation and filing of "Plaintiff's Supplemental Statement And Brief," which was filed pursuant to the court's order of June 8, 1976. Since there is no evidence of the cost or reasonableness of the fee, it is necessary to remand the question to the trial judge for his determination.

### IV. *Conclusion*

The case is remanded to the trial judge for his determination by trial or other proceedings of the reasonable cost of preparing and filing "Plaintiff's Supplemental Statement And Brief." Except for this unresolved question, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.