Vernon W. SCHUMACHER

v.

The UNITED STATES.

No. 43–86C.

United States Claims Court.

Jan. 29, 1987.

Order May 14, 1987.

Timothy J. Lowenberg, Tacoma, Wash., for plaintiff.

George M. Beasley, III, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant, Richard Neely, Sr. Atty., Office of the Sol., Pacific Northwest Region, U.S. Dept. of the Interior, of counsel.

## OPINION

MARGOLIS, Judge.

Plaintiff Vernon W. Schumacher brought this action for breach of an express oral agreement by the National Park Service (NPS) of the Department of the Interior granting him a permit to construct and operate a fish processing plant in the remote area of Dry Bay, Alaska. Defendant moved for summary judgment asserting that the plaintiff failed to exhaust his administrative remedies, that the failure to grant a special use permit after so promising sounds in tort, and that there was no contract, either express or implied in fact, to issue the permit to plaintiff. Plaintiff opposed this motion because of the exist-

ence of alleged genuine issues of material fact. After consideration of the record and after oral argument, the motion for summary judgment is granted.

## FACTS

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether there is a genuine issue of material fact must be resolved in favor of the non-moving party. *Housing Corporation of America v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). In addition, the "inferences to be drawn from the ... facts ... must be viewed in the light most favorable to the party opposing the motion" for summary judgment. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Ball v. United States*, 1 Cl.Ct. 180, 183 (1982). For these reasons, the facts as stated herein are those espoused by the plaintiff, with inferences drawn accordingly.

Plaintiff Vernon W. Schumacher has been a commercial fisherman in the Dry Bay area of the Glacier Bay National Preserve in Alaska for more than 17 years. During that time there has been only one fish processing plant in the Dry Bay area, which has resulted on occasion in plaintiff being required to watch the fish he caught rot because the existing plant received more fish than it could process. Unless a fisherman has the financial means to fly fish out of the area, a severe loss occurs when the processing plant shuts down.

In late 1980, the plaintiff submitted an application to the National Forest Service (NFS) for a special use permit for construction of a plant where he could process the fish he caught. Such "processing" of his fish involved removing the heads and putting the fish "on ice" prior to flying them out to market. NFS personnel assured the

plaintiff that there would be no problem obtaining the permit.

On December 2, 1980 Congress passed the Alaska National Interest Lands Conservation Act (ANILCA), Pub.L. No. 96–487, 94 Stat. 2374, *codified in* various sections of 16 U.S.C., which designated the area involved here as part of the Glacier Bay National Preserve and transferred it to the jurisdiction of the Secretary of the Interior and the NPS. ANILCA specified that the Secretary could take no action to restrict unreasonably the exercise of valid commercial fishing rights or privileges obtained pursuant to law existing at that time. 16 U.S.C. § 410hh-4 (1982). As a result of ANILCA, the jurisdiction over plaintiff's request for a permit to build the processing plant was transferred to the NPS. The authority to issue permits was delegated from the Secretary to the head of the NPS and then redelegated to the NPS Regional Directors and the appropriate Park Superintendents.

Plaintiff was informed by NFS personnel of the responsible NPS official through whom to pursue his special permit request. Because the NPS office with responsibility for the area was shorthanded, and because it wanted to "get to know the resources and the users of the area better," no written fishing permits were issued for the year 1981. Thus, each fisherman was issued and relied upon an "oral" permit based on previous activity in the area. Plaintiff explains that the Dry Bay area is an extremely remote, frequently frozen area of Alaska where there is no telephone service, the mail is delivered only sporadically, and even radio transmission is sometimes not possible because of atmospheric conditions. Plaintiff thus relied for his actions on the rules of the "bush," *i.e.*, it was necessary to rely on oral assurances in order to conduct business affairs in this remote area.

At various times during the years 1981 and 1982 the plaintiff provided information to NPS officials on the plans for his processing plant. In addition, he frequently called and, where possible, wrote to inquire about the status of his permit request. In

September of 1982 a park ranger visited the plaintiff and his family at his fishing camp and informed the plaintiff that his permit had been approved by the NPS Regional Director. Later that month, plaintiff received a letter which specified the conditions under which the permit would be effective. Plaintiff was required to meet several conditions and obtain licenses specified by the State of Alaska, and to take such actions as building a bear-proof waste disposal site. Plaintiff complied with all required actions. In June 1983 plaintiff received written permission from the NPS to drill holes for a perk test at the processing plant site and to begin construction of the bear-proof fence. In early 1983 plaintiff began the process of obtaining bank loans to finance the construction of the processing plant; plaintiff alleges that he called the responsible NPS official prior to final action on the loan papers and was told that there was no problem with the permit. By the end of July 1983, plaintiff had obtained all necessary licenses from the State of Alaska.

In mid-August of 1983 the NPS sent plaintiff a written permit and requested that plaintiff sign the permit and submit the appropriate fee to the NPS. The letter stated that "if" the permit was approved, the NPS would send the plaintiff a signed copy and that he could then begin actual construction of the plant. Plaintiff interprets this action as the written confirmation of the oral processing plant permit he had obtained in 1982, and that the signed written permit would constitute permission to begin actual construction of the plant itself. Plaintiff had previously purchased building materials and shipped them to the Dry Bay site. Plaintiff acknowledged at oral argument that the written permit embodied the oral contract between the plaintiff and defendant.

Between August and December of 1983 it became obvious that there were problems afoot for plaintiff's processing plant. The NPS first informed plaintiff that it would be necessary for an environmental assessment to be performed, and later that a public hearing would be necessary. Plaintiff alleges that these actions were politically motivated as the result of pressure by the Native American owners of the sole existing processing plant in the area; defendant maintains that provisions of ANILCA required the environmental assessment and the hearing. In any event, the result of these actions was the final denial of the permit and permission for plaintiff to build the processing plant, communicated to the plaintiff in early February and confirmed in writing on February 6, 1984. The letter enclosed "Claim for Damage" forms and informed the plaintiff that after a settlement amount had been determined, it "takes approximately two months to receive payment."

Plaintiff contacted the NPS Regional Director by telephone within a few days of the denial to request reconsideration of the action revoking his oral permit. He also requested in writing reconsideration by the Park Superintendent within a week of the denial and again when the damage claim forms were submitted. Plaintiff claims that he was told that the NPS had determined that it was preferable to pay his damages rather than risk the wrath of the Native Americans opposed to his processing plant. Plaintiff's damage claim was processed through every administrative channel at the Department of the Interior, only to be vetoed by the Department of Justice because it fell within the "discretionary function" and "misrepresentation" exceptions to the Federal Tort Claims Act. Plaintiff then filed suit in this court.

## DISCUSSION

Defendant offers numerous reasons why a grant of summary judgment is appropriate in this case, among them that plaintiff failed to exhaust required administrative remedies, that the failure of the NPS to issue the permit as promised constitutes a tort which is not within the Claims Court's jurisdiction, and that the promises by NPS personnel to issue the permit do not constitute contractual administrative actions reviewable by the Claims Court. Plaintiff claims that summary judgment is inappropriate because at trial he will prove that the permit was issued orally, as is common

in the bush country of Alaska, and that this constitutes a contract between the plaintiff and the government. It is unnecessary for the court to address most of the allegations of the defendant, because the terms of the permit itself define the remedy for its revocation. For purposes of this summary judgment motion, the court assumes that the actions of plaintiff and the NPS constituted an express oral contract and that the contract was breached; the unfortunate result, however, remains that the plaintiff may not recover damages for this breach.

## I. *Exhaustion of administrative remedy*

Defendant claims that the applicable regulations require an appeal to the NPS Regional Director within 180 days of the denial and that only the written decision of that individual on appeal can constitute "final agency action" in the case of a permit denial. Defendant claims that because the plaintiff did not file an appeal pursuant to the regulation, and thus did not receive a final agency decision, his suit is barred by his failure to exhaust the required administrative remedy. The regulation, 36 C.F.R. § 13.31 (1986), states in part:

(b) *Denial and appeal procedures.*

(1) An applicant whose application for a permit ... has been denied by the Superintendent has the right to have the application considered by the Regional Director by contacting him/her within 180 days of the issuance of the denial.

    \*     \*     \*     \*     \*     \*

(2) ... within a reasonable period of time, the Regional Director shall affirm, reverse, or modify the denial of the Superintendent and shall set forth in writing the basis for the decision.…

An evaluation of the language of the regulation and its agency explanation reveal that plaintiff did exhaust his administrative remedy. Plaintiff is correct that the actions of both parties must be evaluated in light of the unique relation between bush and metropolitan areas in Alaska. *See, e.g., Aguchak v. Montgomery Ward Company, Inc.*, 520 P.2d 1352, 1356–57 (Alaska 1974) (applying the due process clause to the unique relation between bush

and metropolitan areas in Alaska). The regulation requires only that an applicant "contact" the Regional Director; no method of contact is specified. The agency, in explaining the proposed regulation, stated that the "appeals system was established with a view toward minimizing the requirements imposed upon the applicant during the appeal process." 46 Fed.Reg. 5648 (January 19, 1981). It appears that the agency appreciated the realities of doing business in the bush, as plaintiff has stated.

The regulation requires that the Regional Director shall set forth the reasons for the decision in writing. Even where an administrative official has discretion to take an action, the official is bound by agency regulations. *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957); *Cruz-Casado v. United States*, 213 Ct.Cl. 498, 502–03, 553 F.2d 672, 675 (1977); *McCarthy v. United States*, 7 Cl.Ct. 390, 396 (1985). Thus, the Regional Director was bound to prepare a written decision because plaintiff "contacted" him by telephone to request reconsideration after receiving the decision of the Superintendent to deny his permit application. The court will not deny judicial review to plaintiff because the agency failed to perform an action required by its own regulations.

## II. *Tort and contract issues*

Defendant claims also that summary judgment should be granted for two additional reasons. First, it claims the issuance of a permit does not give rise to a contract. Rather, the defendant asserts, the plaintiff is seeking damages for the misrepresentations of NPS employees who told plaintiff that his permit was granted—a claim sounding in tort over which this court has no jurisdiction. Defendant also claims that no express or implied in fact contract existed to issue the permit for a variety of reasons. The court need not address either of these offered reasons for granting summary judgment, however. As discussed previously, the court assumes for this pur-

pose that an express oral contract was made and breached by the government.

■ Plaintiff acknowledged that the terms of his contract with the NPS were those contained in the written permit sent to him in August 1983, which he signed. The terms of the permit "contract" are those contained in the "conditions of this permit," Department of the Interior Form 10–114, as supplemented. Plaintiff's permit, No. CX9815-3-0023, contained 33 conditions. Condition 15, "Revocation," stated that "[t]his permit may be terminated upon breach of any of the conditions herein or at the discretion of the Director, National Park Service." Condition 7, "Removal of structures and improvements," states in part that

> [u]pon the the expiration of this permit ... or its termination for any reason prior to its expiration date, the permittee ... shall remove within such reasonable period ... not to exceed 90 days ... all structures and improvements placed on the premises.... If the permittee fails to remove all such structures ... they shall become the property of the United States....

Condition 16 extended the period for removal of structures and improvements from 90 days to one year. By its terms, therefore, the "contract" between the plaintiff and the NPS contemplated that the remedy for premature termination would be permission to remove the structures placed on the land. Both parties to the contract are bound by its terms, unless such terms are unconscionable. *See, e.g., Reichhold Chemicals, Inc. v. United States*, 11 Cl.Ct. 150, 153 (1986) (limitation of action clause in contract binds both parties); *Forest Environmental Services Co. v. United States*, 5 Cl.Ct. 774, 777 (1984) (a party to a contract is bound by its terms unless some defense to the contract exists).

In the circumstances of the issuance of permits to use national park land for commercial purposes, it cannot be stated that this remedy is unconscionable. Thus, even accepting plaintiff's characterization of the oral granting of the permit for his fish processing plant as a contract does not result in the payment to plaintiff of monetary damages. Nothing is contained in the record concerning whether plaintiff was able to remove the building materials he had transported to the Dry Bay site; the court is hopeful that plaintiff was able to salvage some of his expenditures. Regardless of the court's sympathy for the circumstances of this plaintiff, however, the terms of the permit itself preclude an award of monetary damages.

## CONCLUSION

Taking the facts as given by the plaintiff and using the inferences most favorable to him still results in granting the defendant's motion for summary judgment because there is no basis on which to award damages to the plaintiff. The clerk will dismiss the complaint. Each party is to bear its own costs.

## ORDER

This court granted defendant's motion for summary judgment in an opinion dated January 29, 1987. On February 6, 1987, the plaintiff filed a motion for reconsideration of that decision, which the defendant opposes.

Solely for purposes of deciding the summary judgment motion, the court assumed that the action of the parties in this case constituted an express contract and that the contract was breached. The court did not, and expressly does not now, address the question of whether a contract may ever be found in the circumstances of a permit to use real property. *See Danks v. Fields*, 696 F.2d 572 (8th Cir.1982).

As stated in the court's opinion of January 29, 1987, the plaintiff alleges that the denial of its written fish-processing permit was politically motivated to avoid a confrontation with the Native American owners of the only other processing plant in the area. Plaintiff now further alleges that this conduct constitutes bad faith which overrides the limitation in the permit which provides that the remedy for premature termination of a permit is removal of improvements on the land.

An analysis of government "bad faith" must begin with the presumption that the government's agents act in good faith, and "well-nigh irrefragable proof" is necessary to prove the contrary. *Kalvar Corporation v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Proof of bad faith has been defined to consist of proof that the actions of the government were "motivated alone by malice." *Gadsden v. United States*, 111 Ct.Cl. 487, 489, 78 F.Supp. 126, 127 (1948). Another finding of bad faith was defined to involve a course of government conduct which was "designedly oppressive." *Struck Construction Co. v. United States*, 96 Ct.Cl. 186, 222 (1942). Bad faith, therefore, is equated with a *specific intent* to injure the plaintiff. *Torncello v. United States*, 231 Ct.Cl. 20, 46–47, 681 F.2d 756, 771 (1982) (*en banc*); *Kalvar*, 211 Ct.Cl. at 198–99, 543 F.2d at 1301–02.

■ Even accepting the plaintiff's allegations that the reasons for the government's actions were "political" and to avoid confrontation, this does not rise to the *specific intent* to harm the plaintiff which is necessary to find bad faith in the actions of the government. Furthermore, the plaintiff has not alleged specific facts which show a degree of animus towards him necessary to show bad faith in the government's actions. Any possible finding of intent to harm the plaintiff is negated by the actions of the government after the denial of the written permit in this case; the government officials apologized to the plaintiff and attempted to obtain payment for the plaintiff's expenses.

Because the plaintiff may not prevail even taking as true all of his allegations for purpose of this motion, the motion for reconsideration is denied.