**Bill HUBBARD, individually and doing business as Bill Hubbard & Associates, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–396C.

United States Court of Federal Claims.

March 28, 2002.

Steve McNichols, Jr., Pleasanton, California, for plaintiff.

Darshpaul Singh Padda, with whom were Richard E. Rice, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Kevin Allison, NEXCOM, Virginia Beach, Virginia, was of counsel.

## FINAL OPINION AND ORDER

SMITH, Senior Judge.

This case is before the court after trial on both liability and damages. Plaintiff, Bill Hubbard, doing business as Bill Hubbard & Associates, contracted with the United States Navy Exchange (Exchange) in 1984 to build and operate a mini-storage facility at Lemoore Naval Air Station (Lemoore) in California. Plaintiff contends that, beginning in 1993, the Exchange engaged in a series of acts that breached provisions of the contract and violated the implied covenant of good faith and fair dealing. This final opinion is identical in all respects to a Preliminary Opinion issued to the parties on February 5, 1999, except that the court denied plaintiff's motion filed under RCFC 59 subsequent to the issuance of the preliminary opinion. The

Preliminary Opinion was issued in an attempt to promote a settlement of this case.

## FACTS

On May 31, 1984, the Navy Resale and Services Support Office in Oakland, California issued a Request for Proposals (RFP) for the construction and possible operation of a mini-storage rental facility for military personnel stationed at Lemoore Naval Air Station. The RFP advised prospective bidders that the storage facility would be either Exchange operated—that is, operated by service personnel employed by the Navy Exchange—or concession operated—that is, operated by the contractor as concessionaire. Contractors would be paid for the construction and operation of the storage facility by receiving a percentage of the revenues from the rental of the units. The RFP thus advised prospective bidders to submit contract offers which included the percentage of rental revenue that the Exchange would be entitled to under either an Exchange-operated or contractor-as-concessionaire-operated system.

Plaintiff Bill Hubbard, a Contra Costa, California contractor who does business as Bill Hubbard and Associates, submitted a proposal to build and operate the facility. Mr. Hubbard's offer proposed returning 6.5% of the revenue to the Exchange if the facility were concession-operated and 17.5% if it were Exchange-operated. (That is, Mr. Hubbard would receive 93.5% of the gross revenues if he ran the storage facility, and 82.5% of gross revenues if Exchange personnel were used to staff the storage facility.)

On July 27, 1984, the contracting officer issued an acceptance of Mr. Hubbard's proposal, with the facility to be Exchange-operated and Mr. Hubbard to return 17.5% of gross revenue to the Exchange. The period of performance was to be five years, from August 6, 1984 to August 5, 1989, with the possibility that the parties could extend the agreement for three one-year periods by mutual consent. Ultimately, the contract was modified to extend the period of performance until July 1997.

After formation of the contract, Hubbard proceeded to build the facility subject to the specifications of the contract and subsequent modifications. The Navy in return provided a rental office and check-in/check-out area near the site of the storage units, known as the Rent All Center. The Rent All Center was also used by the Exchange to rent other products to service personnel, such as televisions and washers and dryers. The Exchange also trained Exchange personnel to operate the facility.

The instant dispute centers around a series of actions taken by the Navy beginning in 1993 that Mr. Hubbard contends either breached express or implied-in-fact provisions of the contract, or which breached the implied covenant of good faith and fair dealing.

First, over the vigorous protestations of Mr. Hubbard, the Commander of NAS Lemoore, Captain Al Gorthy, Jr., moved the Rent All Center from its location at the time he bid for the contract to a more distant off-site location. Mr. Hubbard contends that this violates a requirement of the contract that the Exchange provide an on-site rental and management office.

Second, just prior to the move plaintiff contends that the Navy cut off telephone service to the facility, in violation of the express and implied terms of the contract. Plaintiff contends that this cut-off greatly impaired plaintiff's ability to operate the mini-storage in a viable and profitable manner.

Third, plaintiff contends that the Exchange, in violation of the express terms of the contract, reduced the hours of operation for the Rent All Center.

Fourth, plaintiff contends that the Exchange failed to post appropriate signs and notices to inform customers of the new location of the mini-storage facility.

Fifth, plaintiff contends that Captain Gorthy permitted firefighters to engage in practice and training exercises on the site of the mini-storage facility, and permitted the firefighters to direct high-powered hoses at the mini-storage facility, damaging the structures and the contents of patrons of the facility.

Sixth, plaintiff contends that the Navy permitted other contractors to park their trucks at the mini-storage facility, impairing Mr. Hubbard's ability to operate the facility and also directly damaging the concrete slab on which Mr. Hubbard planned to build the fourth and last of the mini storage buildings on the site.

Seventh, in a contention not contained in plaintiff's complaint, but argued at trial, plaintiff contends that the parties entered into a modification of the contract to extend its terms for three additional years, until July 2000.

### DISCUSSION

*Movement of the Rent All Center*

■ In June 1993 the Commander of NAS Lemoore, Captain Gorthy, ordered the Rent All Center moved from the location it had inhabited since the inception of Mr. Hubbard's contract to a new location. The old location, although it did not abut the mini-storage units, was within view of the units and was on the access road to the mini-storage area. The Rent All Center was moved to the base service station, which, according to the testimony, was approximately two miles from the storage units, was not within view of the units and was not on the access road to the mini-storage facility.

Mr. Hubbard had vigorously opposed the proposed move of the Rent All Center, and had expressed his opposition to Captain Gorthy, to no avail. Mr. Hubbard believed that, for a variety of reasons, the movement of the office would affect business negatively. He believed that the move would impair customer service and would make it less convenient for customers to use the facility. He also believed that the move away from the site would impair security, or more importantly, the perception of security at the mini-storage units, which both Mr. Hubbard and his expert testified were critical to attracting and keeping customers.

Captain Gorthy testified that he decided to move the Rent All Center for two principal reasons. The first, which he conveyed to Mr.

Hubbard prior to the move, was because he viewed the Rent All Center office to be an eyesore. The second reason, which Captain Gorthy testified to at trial and which he testified was the primary reason for the move, was his concern about the welfare of the Exchange workers at the Rent All Center. Though he also admitted on cross examination that he had never spoken to those workers about any workplace issues.

Plaintiff alleges that the decision to move of the Rent All Center violated the contract, while defendant argues that the Exchange owed no duty to keep the office in the same location and only owed plaintiff a general duty to make reasonable decisions. The dispute over what duties were owed to whom offers a good backdrop for understanding the contract between the parties.

The RFP, as modified, provided that a security fence and sales office would be provided by the Exchange. Plaintiff has argued that it relied upon the location of the Rent All Center in formulating its bid, and that its movement violated a material term of the contract. Defendant counters that this provision places no affirmative duty on the Exchange; rather, this information was provided to the bidder so that the bidder would not have to calculate such construction costs as it formulated its bid.

It is reasonable to believe, as Mr. Hubbard testified, that he relied on the location of the Rent All Center in formulating his bid. Both Mr. Hubbard and his expert testified as to the importance of the location of the management office in operating a successful mini-storage business, and its location would be relevant to Mr. Hubbard's determination about whether the venture could be profitable, and at what price. At the same time, it is clear to the court that the contract does not explicitly obligate the Exchange to maintain the office in the same location indefinitely. Defendant's formulation of the standard appears correct: as to such matters the Exchange must act reasonably in an effort not to impair the ability of Mr. Hubbard to earn a fair return on his investment.

Normally, in a contract of this sort, such a dispute likely would never arise, since both parties ultimately profit directly if more rental revenue is generated. Hence it is unlikely that one party would take steps to harm the other because it would harm itself as well. This is naturally the case when the two parties to such a contract, which approximates a joint venture, are only concerned with their return. In this case, however, the Exchange has to deal other concerns, primarily those of the base administration, which may have concerns beyond maximizing its return on investment in such a venture. The concerns of the base commander might not necessarily comport with those of a contractor, such as Hubbard, who is interested exclusively in the return on his capital investment.[1]

Just as plaintiff bid the contract with an understanding that the rental office was in a particular location, he also bid the contract knowing that it was subject to the authority of the base commander. The only reasonable understanding of this provision is that the Exchange is required, as the RFP as modified requires, to provide a rental office, and that the rental office that is provided will remain a reasonable approximation of that upon which Mr. Hubbard developed his bid, so that Mr. Hubbard's ability to earn a return on his investment is not thwarted.

Even in a situation such as this one, where the interests of the base commander and the contractor might not be in complete alignment, it is necessary that such decisions be made in consultation with the contractor and in the interests of the service members stationed at the base. This is ultimately in the interest of the contractor as well. It is for this reason that a breach of the reasonableness requirement is little different than a breach of the implied covenant of good faith and fair dealing imputed to all contracting parties. Both would almost certainly require defendant to act in bad faith, in an effort to

---

1. It is thus not surprising that such arrangements are rare in military contracting (and the court would suppose in other areas of government contracting). As Gary Carter, the contracting officer for this contract, testified, he has only seen six such contracts among the two to three thousand he has administered in his career.

harm the business interests of Mr. Hubbard, possibly at the expense of its own interests.

Based on the evidence, the court finds that the move of the Rent All Center breached both the implied duty to make reasonable decisions and the implied covenant of good faith and fair dealing. The court realizes that the bar to proving a breach of the implied covenant of good faith and fair dealing is quite high, because it is presumed that government officials act in good faith in the discharge of their duties. *Spezzaferro v. Federal Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986); *Torncello v. United States*, 681 F.2d 756, 770, 231 Ct.Cl. 20 (Ct.Cl.1982); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976). Plaintiff must therefore overcome the rebuttable presumption that government officials act in good faith by proving malice, or bad faith; "in other words, a specific intent to injure the plaintiff on the part of a government official." *Morris v. United States*, 33 Fed.Cl. 733, 752 (1995); *Torncello*, 681 F.2d at 771.

In this instance, the evidence adduced at trial strongly demonstrates that the move of the Rent All office was effected in bad faith, with an evident disregard, and indeed hostility to, the government's contracting partner. The testimony of Captain Gorthy as to his reasons for moving the Rent All Center was simply not credible. Captain Gorthy indicated that he moved the Rent All Center because of his concern for the welfare of the employees working at the Center and because of his concern that the building was an eyesore.

The evidence demonstrated that these were, at best, pretexts for moving. Captain Gorthy stated several times that his "primary concern" was "[t]o get the workers into a better working condition." Yet, according to Gloria Thomas, the principal Exchange employee at the Rent All Center, Captain Gorthy never asked her about working conditions at the old Rent All Center. Indeed, this is so, according to her testimony, even though Captain Gorthy personally visited the Rent All Center on at least two occasions prior to the move. Ms. Thomas had never complained about the conditions, and she had never had anyone from either the Navy or the Exchange ask about the working conditions.

What's more, the new Rent All Center cannot be considered an improvement in conditions for the employees. It is not as if the Navy put the employees in a new, more employee-friendly environment. Rather, the Rent All Center was moved to the base service station showroom, an exposed office within an office. It was no better than a lateral move as far as the welfare of the Rent All Center employees were concerned. This would tend further to undercut Captain Gorthy's claim that the move was taken for the employees' benefit.

Second, the stated reason given to Mr. Hubbard by Captain Gorthy at the time of the move—that the Rent All Center building was an eyesore—is dubious at best. Instead of either demolishing the building after moving the Rent All Center, or making improvements to improve the aesthetics, Captain Gorthy permitted another Navy unit to use the building, without improvements. This was still the case at the time of trial, two years after the Rent All Center move.

Although Captain Gorthy did testify that he would not have moved the Rent All Center if he thought it would lose revenue, it is clear that he had made his decision to move the office without consulting, or really considering the concerns of, Mr. Hubbard. Indeed, Captain Gorthy fully acknowledged that he was willing to keep the Rent All Center in place if Mr. Hubbard increased the cut of the revenue that the Exchange would take. This suggests that employee welfare and base aesthetics were important only so far as they would permit Captain Gorthy to extract more revenue from Mr. Hubbard. While the court can in some respects only hazard a guess as to Captain Gorthy's motives for the move, it is clear to the court that the stated reasons for the move were pretextual, and that the move was engineered in bad faith, without regard, indeed, with deliberate and bad faith disregard, for the legitimate business interests of Mr. Hubbard.[2]

**2.** Captain Gorthy revealed something about his motives during his testimony. In response to

*Cut-off of telephone service*

Plaintiff contends that the Exchange cut off telephone service, without warning, on May 27, 1993, almost a month prior to the move on June 24, 1993. There seems no dispute that, for a period of three to four weeks, the phones were not ringing at the Rent All Center. Richard McKenzie, General Manager of the Exchange at the time, put in an order with the phone service to change phone service to the new location on April 27, 1993. Mr. McKenzie testified credibly that he was under the impression that the phone was supposed to ring in both the new and old locations for a period of time after the switch, which apparently never happened. Mr. Hubbard testified that he attempted to resolve the phone situation, to no avail.

Although defendant acknowledges that it had a general duty under the contract to provide phone service, there is no evidence in the record that this action was anything other than a bureaucratic snafu. There is no evidence that Captain Gorthy directed that the phones be cut off, or that Mr. McKenzie engineered such an act to harm Mr. Hubbard. While the evidence does suggest that the Exchange did not move quickly to correct the error, the evidence suggests bureaucratic inertia rather than malicious intent.

*Reduction in office hours*

The evidence is undisputed that, after the move from the old Rent All Center to the new location in the service station, the hours for the Rent All Center were reduced on Sundays, which plaintiff contends was in violation of the express terms of the contract. The RFP provided that the "concessionaire" shall provide employees for certain hours during the week. Assuming that these concessionaire provisions apply to the Exchange as operator of the mini-storage rental business,[3] the Exchange has technically complied with the Sunday hour requirements in the RFP, which requires sufficient employees to "provide efficient service" during the hours of 11:00 a.m. and 4:00 p.m. on Sundays. Plaintiff points to a Modification to the contract which required that the gate surrounding the mini-storage buildings, and the buildings themselves, be opened no later than 7:30 a.m. and closed no earlier than 4:30 p.m. This modification is silent, however, on the obligations of the concessionaire to maintain office hours. Defendant has thus not violated the express terms of the contract. Moreover, there is no indication that this was done in violation of the covenant of good faith and fair dealing, since the hours were modified to be consistent with those of the service station (not surprising, since the new office was located within the service station).

*Sign Requirements*

Plaintiff contends that the Exchange failed to post signs as required under the contract. Although the evidence indicates a slight delay in posting of the signs at the new facility, and the sign indicating that the Rent All

---

questions about a proposal Mr. Hubbard made to make certain improvements, Captain Gorthy testified that it was his "gut feeling" that "it would have been in the best interest of the Navy to completely remove itself from any type of long-term contract." He also testified that he believed "that the Navy could run and manage and operate a mini-storage complex, as good, if not, better than an outside contractor." The logical inference to be drawn is that Captain Gorthy was hostile to a contracting relationship, such as this one, which approximated a partnership.

3. There has been much debate about whether the Exchange was bound by the "concessionaire" language of the RFP. The RFP was very poorly drafted and contained numerous ambiguities. For instance, "concessionaire" was used at times clearly to refer to the prospective contractor, and at other times clearly to the operator of the facility. This required a modification to the contract which converted references to concession-

aire to contractor, which in itself was not a particularly coherent modification.

This situation is further confused by the two options, Exchange-operated and concession-operated, for which bidders had to formulate bids. The government argues that, since it ultimately picked the Exchange-operated option, those portions of the RFP that relate to the concessionaire's operation of the facility do not bind the government. Such an understanding is fundamentally implausible, since it would require a prospective bidder to formulate a bid without any information as to how the joint business venture would be operated, and with no assurances as to how the business would actually be run. It would obviously be impossible to make a bid under such a scenario. The only plausible reading of the contract is that the government was setting forth the obligations of the party that would ultimately operate the concession, whether that party was a bidder or the Exchange.

Center had moved was, to put it charitably, not of a professional standard, the court finds that defendant fulfilled its obligations under the contract, and that the delays can be attributed to bureaucratic malaise rather than malfeasance.

*Fire Drill on Mini–Storage Site*

The evidence is undisputed that, on August 14, 1993, the base fire department conducted fire drills on the site of the mini-storage facility, including spraying of the buildings directly. The evidence also indicates that some of the water penetrated the building and leaked into at least one storage unit. Plaintiff contends that conducting such drills was beyond the scope of the Exchange's duties and breached the contract.

Captain Gorthy testified that he had no knowledge of the incident, and that after it occurred he talked to the operations officer in charge of the fire department and informed him that the area where the mini-storage units were was off-limits. The court does have concerns about the credibility of the story, in light of Captain Gorthy's patently incredible statements about the reasons for moving the Rent All Center. There was no hard evidence adduced at trial to suggest that the fire department action was directed by Captain Gorthy or someone else in an effort to impair Mr. Hubbard's ability to perform under the contract. However, Captain Gorthy did state that he had never been able to determine who ordered the drill after he investigated the incident. In light of Captain Gorthy's otherwise extreme attentiveness to all activities on base, his complete ignorance of the fire drill incident, both before and after it happened, strikes the court as strange.

*Contractors Parking at the Mini–Storage Site*

The evidence is undisputed that, notwithstanding Mr. Hubbard's right to have exclusive access to the mini-storage area, defendant had permitted contractors to park in the area, including on the fourth slab where the fourth mini-storage building ultimately was to be built. In addition to damage to the fourth slab, plaintiff contends that the presence of the contractors has made it more difficult for the business to be run in a professional manner. This is not even really disputed by defendant.

*Modification 12*

Plaintiff contends that the government agreed in 1992 to modify the contract and provide for the contract to run for three additional years, from 1997 until 2000. As evidence of that, plaintiff provided a copy of the modification, signed by Mr. Hubbard. The modification states:

> This contract may be renewed for a maximum of three (3) additional periods of twelve (12) months each. Each such renewal shall be subject to the written notice of the party, at least 90 days prior to contract termination, of their renewal intentions. Such preliminary notice does not commit either party to the contract extension.

Plaintiff testified that, although his copy of the modification was only signed by himself, it was the custom to receive three copies, sign three and keep one for his records. Sometimes, but not always, he contended, he received a copy signed and executed by the contracting officer. No such copy apparently was provided to him.

Defendant made several challenges to this argument, all of them valid. First, defendant pointed out, quite correctly, that the modification, on its face, represents only an agreement to agree on procedures for renewal. It does not mandate three additional years. Second, there is no evidence that this modification was ever executed. Third, the contracting officer, Gary Carter, testified quite credibly that it was sent in error and had not been executed. Mr. Carter stated that the modification had been sent by a subordinate, who had been instructed that this renewal modification was to be sent to all contractors who had such three-year renewals included in their contracts. The subordinate had not realized that the three-year renewal clause in Mr. Hubbard's contract had been rescinded by an earlier modification which had extended the contract until July 1997. Further, Mr. Carter testified that he informed Mr. Hubbard of this fact both in person in 1993 and again by letter in February 1995, after

receiving a certified claim with projected income losses through 2000.

### DAMAGES

■ Plaintiff has provided very credible expert testimony from Mr. John O'Keefe, a 15-year veteran of the mini-storage industry, who developed a model calculating gross revenues from 1988 through 1997.[4] Mr. O'Keefe's model was premised on a 90 percent occupancy rate and the building of the fourth building (once the 80 percent occupancy threshold had been met in 1987 or 1988). Although Mr. O'Keefe acknowledged that he had never worked with such a facility on a military base, he had experience profiling military shoppers. He credibly contrasted the military market to the general market, and offered testimony as to why the occupancy rate that he built into his revenue model was reasonable.

However, the model highlights a fundamental problem with plaintiff's case for damages. It was clear to the court during trial that the action taken by Captain Gorthy in moving the Rent All Center was basically the proverbial straw that broke the camel's back. That action, and the subsequent actions, represented to plaintiff the culmination of his mounting frustrations in dealing with the Navy and the Exchange since the beginning of the contract. Based on many references at trial to other actions taken prior to 1993, Mr. Hubbard was frustrated with the Navy's unwillingness, or indifference to, making the mini-storage business into a real revenue producer. In short, plaintiff expected, as the RFP required of the concessionaire, that it "shall perform the services hereunder in a first class manner in accordance with standard commercial practice recognized in the industry." Plaintiff believed that the failure

of the Exchange to cooperate in doing so over the years directly impaired efforts to turn the mini-storage business into a viable enterprise which would enable Mr. Hubbard—and the Exchange—to obtain a good return.

Plaintiff's damage model is thus not related to the alleged, and in the case of the Rent All Center move, proved, breach actions. Plaintiff has essentially conceded that it cannot identify specific damages caused by breach actions, with the exception of the damage to the slab. Plaintiff's model is premised on the operation of the mini-storage facility as a first-class operation from the beginning, which, despite Mr. Hubbard's gallant attempts, never happened. In short, plaintiff's damages for the period from 1993 to 1997 as put forward from Mr. O'Keefe's model do not relate to the actual breach actions. They are tied to a multitude of major and minor actions or inactions over the eight years of the contract prior to the suit, which culminated in a business that was far removed from what Mr. O'Keefe had testified it could have been had it been operated in a professional manner from the start.

The court thus is left with two knowns. The first is overwhelming evidence that defendant, through the actions of Captain Gorthy, violated the covenant of good faith and fair dealing in moving the mini-storage rental office. Captain Gorthy had no interest in Mr. Hubbard's legitimate business concerns, was hostile to the very existence of this cooperative contract, and offered unbelievable reasons for the move of the Rent All Center. The court also has a credible revenue model that the court believes states with reasonable certainty, given Mr. O'Keefe's testimony, what revenues should have been had the business been run properly.[5] The

---

4. Mr. O'Keefe also extended the model until the year 2000, under the assumption that modification 12 was executed and extended the contract three years. As discussed earlier, however, modification 12 is not part of the contract and any damage model must only run through 1997.

5. After trial, even though the court had not ordered post-trial briefs, defendant filed a motion for leave to file post-trial brief, with accompanying brief. The brief dealt with the Federal Circuit's decision in *Wells Fargo Bank, N.A. v.*

*United States*, 88 F.3d 1012 (Fed.Cir.1996). Defendant contends that *Wells Fargo* dictates that the damages plaintiff seeks are not recoverable as a matter of law. Plaintiff filed an opposition to the motion for leave, which included a substantive response to the motion. The court grants defendant's motion for leave, and treats plaintiff's opposition as a response to defendant's post-trial brief. The court notes that, in any event, the issue is inapposite given the fundamental problems with causation, but notes that defendant's general statement that, in light

problem is that the revenue model doesn't relate to the damages. Plaintiff has hence proved that defendant breached the implied covenant of good faith and fair dealing, and that its damages model is credible, but plaintiff has not shown, as concededly he cannot, that the damages were caused by defendant's breach. Plaintiff is therefore not entitled to the damages as set forth in Mr. O'Keefe's model.

The court has further endeavored, in reviewing the monthly rental revenues of the mini-storage facility, to determine if there has been a reduction in revenues after the move in June 1993 that can be attributable to the breach. The court has found, however, that rental revenue on a month-to-month basis varied considerably both before and after the breach, and that no reduction or fall-off in rental revenue can be attributable to the move based on the information before the court.

### CONCLUSION AND ORDER

Plaintiff has proved that the central action alleged by plaintiff in its complaint—the move of the Rent All Center—violated the covenant of good faith and fair dealing. Plaintiff has also proved that defendant failed to keep contractors and the fire department off the mini-storage premises, in violation of plaintiff's contract right to exclusive use of this property. Although the court is not convinced that these actions were animated by malice, it is the duty of the Exchange and the Navy to insure Mr. Hubbard's right to possession. Plaintiff has also identified consequential damages to the slab as a result of defendant's failure to keep contractors off the slab. The court therefore orders the following:

1) Plaintiff is entitled to the costs to repair the damaged fourth slab to return it to its condition prior to the damage caused by the contractors.

2) Plaintiff is entitled to any quantifiable damages to plaintiff's property that can be attributed to the fire drills conducted on August 14, 1993.

3) Because of the clear bad faith shown by the Navy in dealing with Mr. Hubbard, Mr. Hubbard has been forced to appeal to this court, after numerous attempts to resolve the case without resort to litigation, because it was impossible to deal reasonably with a business partner that had acted in bad faith. Accordingly, plaintiff is entitled to recover all its attorney costs, fees and expenses related to this litigation, including expert expenses, from the preparation for the filing of this suit until the current date.

**IT IS SO ORDERED.**

of *Wells Fargo,* "a plaintiff may not recover damages for lost profits from the United States," is not the precedent that the court understands.