NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ACLR, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1190

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00767-PEC, Judge Patricia E. Campbell-Smith.

---

Decided: September 27, 2024

---

JOHN BONELLO, Reston Law Group LLP, Reston, VA, argued for plaintiff-appellant. Also represented by THOMAS DAVID.

JOSEPH ALAN PIXLEY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, AUGUSTUS JEFFREY GOLDEN, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY.

---

Before PROST, HUGHES, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

ACLR, LLC ("ACLR") appeals from the United States Court of Federal Claims' grant of summary judgment to the government on ACLR's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and recovery of certain termination-for-convenience damages.  We affirm.

## I

## A

Medicare Part D is a voluntary outpatient prescription drug reimbursement program that went into effect on January 1, 2006.  Under the program, prescription plan sponsors, such as private insurance providers, pay for prescription drugs for their beneficiaries and then receive reimbursements from the government.  Specifically, the Centers for Medicare & Medicaid Services ("CMS") makes monthly prospective payments to insurance providers and then, at the end of each year, reconciles those payments with the insurers' actual costs, to ensure that the government has not overpaid (e.g., by making duplicate payments).

ACLR is a management consulting company that offers recovery auditing services.  On June 17, 2010, ACLR entered into a federal supply schedule contract with the General Services Administration ("GSA"), which made ACLR eligible to offer recovery auditing services to government agencies.  Relevant to this appeal, the GSA contract included Federal Acquisition Regulation ("FAR") 52.212-4(l), which expressly permits an ordering agency, i.e., an agency contracting ACLR's services, such as CMS, to "terminate [a] contract or any part [t]hereof, for its sole convenience." J.A. 4624; *see also* 48 C.F.R. § 52.212-4(l).  This "termination for convenience" provision further sets out the

damages a terminated contractor, such as ACLR, could attempt to recover. It provides that if an ordering agency elects to terminate the contract for convenience, the contractor is entitled to "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate[,] to the satisfaction of the ordering [agency] using its standard record keeping system, have resulted from the termination." J.A. 4624; *see also* 48 C.F.R. § 52.212-4(l).

On December 2, 2010, CMS issued a Request for Quote ("RFQ"), inviting proposals for an award of a contingency fee task order for recovery audit contractor ("RAC") services in support of the Medicare Part D program. The RFQ specifically advised potential bidders that, consistent with the FAR provision in the GSA contract, the "Government may . . . terminate for convenience if it deems such termination to be in the best interest of the Government." J.A. 1941. ACLR submitted a proposal. On January 13, 2011, CMS awarded a task order to ACLR, by which ACLR agreed to identify and seek to recover overpayments CMS had made to private insurers under the Medicare Part D program. The task order incorporated the GSA contract by reference, thereby also incorporating the FAR 52.212-4(l) termination for convenience provision. As the parties do, we henceforth refer to the contract between ACLR and CMS, which includes the provisions of the task order and GSA contract, as the "Part D RAC Contract."

Initially, the task order required that ACLR "perform the work required in accordance with the attached performance work statement (PWS)." J.A. 1174. The PWS did not explicitly require CMS approval for the steps ACLR would take to conduct its audits. Moreover, ACLR had prepared and submitted the PWS along with its proposal, and CMS provided no input regarding the PWS at the time it awarded the task order to ACLR. Therefore, the 2007 audit, which was governed by the terms of the Part D RAC

Contract – including the task order and the PWS – could potentially be conducted in a manner never approved by CMS.

Subsequent events led the parties to spend approximately two years negotiating a Statement of Work ("SOW") that would replace the PWS. On December 31, 2013, ACLR and CMS agreed to eliminate the PWS and substitute in its place the SOW, which explicitly required CMS approval for audits to be conducted by ACLR. The 2010 audit was governed by the terms of the Part D RAC Contract, including the task order and the SOW.

With respect to ACLR's compensation, the task order was explicit that payments to ACLR would be dependent on what ACLR collected on behalf of CMS, providing:

> All payments shall be paid only on a contingency basis. The recovery audit contractor will receive 7.5% of all amounts collected. The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments. . . . *The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected.*

J.A. 1175 (emphasis added).

ACLR performed work for CMS between 2011 and 2015, eventually conducting at least 20 audits. For seven of those audits, ACLR obtained all necessary approvals from CMS, collected monies from private insurers, and was then paid contingency fees for its work on these audits. The remaining thirteen ACLR audits were not approved by CMS. Two of these, relating to payments to insurers for the years 2007 and 2010, are the subject of this appeal.

B

CMS began transmitting the 2007 audit records to ACLR on November 17, 2011, and shortly thereafter ACLR

began reviewing those records. On November 30, 2011, during a conference call, ACLR informed CMS that it had already identified potential duplicate payments in the 2007 records and was ready to commence recovery of the improper payments. On that same call, the CMS Contracting Officer's Technical Representative, Marnie Dorsey, told ACLR that the then-governing PWS was only a "proposal" and "hadn't been approved per se." J.A. 1301-05. The CMS Contracting Officer Desiree Wheeler then told ACLR "[t]o not issue demand letters" to private insurers, effectively terminating the 2007 audit. J.A. 1288; *see also* J.A. 2425 (ACLR report summarizing review of 2007 audit).

No duplicate payments were ever recovered as a result of the 2007 audit. Hence, CMS did not pay ACLR any contingency fees for this work. ACLR contends that, before CMS's breach, it had identified $313,808,241 in potential duplicate payments and is entitled to be paid 7.5% of this amount as contingency fees, which comes to $23,535,616.

In January 2014, CMS authorized ACLR to undertake an audit of 2010 payments, consistent with the then-governing SOW. On June 9, 2014, ACLR provided CMS with its accounting of potential duplicate payments, and in December 2014 it submitted its final 2010 review package. CMS, working with a data validation contractor, found inaccuracies in ACLR's submission and questioned its findings. After much back and forth, CMS terminated the 2010 audit by letter dated April 24, 2015, due to "concerns with the validity of the overall audit results." J.A. 793.

As with the 2007 audit, ACLR never recovered any payments in connection with the 2010 audit and, therefore, CMS did not pay ACLR any contingency fees. ACLR contends it had identified $15,909,552 in duplicate payments during the 2010 audit and is entitled to payment of 7.5%, or $2,209,146, in contingency fees.

C

On July 22, 2015, ACLR filed a complaint in the Court of Federal Claims under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq.*, accusing CMS of breach of contract and breach of the implied covenant of good faith and fair dealing, by "failing to permit ACLR to recover improper payments identified" during the 2007 and 2010 audits. J.A 38. On March 23, 2020, following discovery, extensive briefing, and oral argument, the Court of Federal Claims issued a decision (i) denying ACLR's motion for summary judgment for recovery of contingency fees for its efforts in connection with the 2007 and 2010 audits, and (ii) granting the government's motion for summary judgment that CMS had committed no breach. *See ACLR, LLC v. United States*, 147 Fed. Cl. 548 (2020) ("*ACLR I*"). The trial court specifically found no breach of contract or duty of good faith and fair dealing because it concluded, instead, that CMS had constructively terminated the pertinent portion of the Part D RAC Contract for convenience, and was permitted to do so. Although, prior to the litigation, neither party had ever described what had occurred as a termination for convenience, the Court of Federal Claims determined that this was the only reasonable characterization of what had actually happened.

Because the parties had not adequately addressed what recovery ACLR would be entitled to as a result of a termination for convenience, the trial court remanded the case to CMS. On remand, CMS' contracting officer denied ACLR's damages claim for the 2007 audit in its entirety, because ACLR had been "unable to identify sufficient documentation to support compensat[ion]." J.A. 5132. For the 2010 audit, CMS awarded ACLR $157,318 in termination for convenience damages plus interest.

The parties then returned to the Court of Federal Claims. ACLR filed an amended complaint, seeking termination for convenience damages "of at least $5,923,754," plus interest and attorney's fees. J.A. 5145. On November 19, 2021, the Court of Federal Claims denied ACLR's

motion for summary judgment. *ACLR, LLC v. United States*, 157 Fed. Cl. 324 (2021) ("*ACLR II*").

The government thereafter sought and obtained leave to file a motion for summary judgment based on ACLR's purported failure to keep records sufficient to establish costs it was seeking to recover as damages. The government argued that ACLR had failed to "demonstrate a claim for reasonable charges, with relevant supporting documents allocated to the two audits at issue using its standard record keeping system, as required by the termination for convenience clause in the contract, FAR 52.212-4(l)." J.A. 7248. The Court of Federal Claims granted the government's motion. *See ACLR, LLC v. United States*, 162 Fed. Cl. 610 (2022) ("*ACLR III*").

ACLR timely appealed. The Court of Federal Claims had jurisdiction under 28 U.S.C. § 1491(a)(1) and 41 U.S.C. § 7104(b)(1). We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

The Court of Federal Claims' grant or denial of summary judgment is "in all respects reviewed *de novo*." *Barlow v. United States*, 86 F.4th 1347, 1353 (Fed. Cir. 2023). "Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stimson Lumber Co. v. United States*, 82 F.4th 1346, 1350 (Fed. Cir. 2023) (internal quotation marks omitted). We view "all factual inferences . . . in the light most favorable to the non-moving party." *Chi. Coating Co., LLC v. United States*, 892 F.3d 1164, 1169 (Fed. Cir. 2018).

## III

On appeal, ACLR presses four issues. It argues that the Court of Federal Claims erred by: (1) denying it summary judgment and instead granting summary judgment

to the government (in *ACLR I*) on ACLR's claims of breach of contract and breach of the implied covenant of good faith and fair dealing; (2) holding (in *ACLR II*) ACLR is not entitled to compensation for a percentage of the contract price; (3) denying (in *ACLR II*) ACLR's motion for summary judgment to recover settlement claim costs; and (4) granting summary judgment (in *ACLR III*) to the government on the issue of ACLR's standard record-keeping system. We address each issue in turn.

## A

We first agree with the Court of Federal Claims that CMS did not breach the Part D RAC Contract – which includes the task order, GSA contract, and either the PWS (for the 2007 audit) or the SOW (for the 2010 audit) – and also did not breach the implied covenant of good faith and fair dealing. It is undisputed that CMS and ACLR had a valid contractual relationship. It is further undisputed that CMS terminated the portion of the contract that related to ACLR's 2007 and 2010 audits. The parties disagree, however, over whether CMS' termination was a breach of contract and/or of the implied covenant. We, like the Court of Federal Claims, find that no breach occurred.

As an initial matter, ACLR is wrong when it asserts that the government waived its constructive termination for convenience defense. It is true that CMS did not invoke FAR 52.212-4(l) or make any reference to termination for convenience when it directed ACLR not to proceed with the 2007 and 2010 audits. But that simply makes CMS' termination for convenience *constructive* rather than *express*. *See generally JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 708 (Fed. Cir. 2021) ("Where a contracting officer does not actually exercise a contract's termination for convenience clause but stops or curtails a contractor's performance for ultimately questionable or invalid reasons, the contract's termination for convenience clause may

constructively justify the government's actions, avoid breach, and limit liability.").

Nor do we agree with ACLR that the government was required to plead constructive termination for convenience as an affirmative defense no later than in its answer. The district court cases on which ACLR relies, which are of course not binding,[1] address only *express* termination for convenience, and do not persuade us to find the government waived *constructive* termination for convenience by not including it in its initial pleading. This is especially so here, where the government raised constructive termination for convenience in its summary judgment briefing, after which the Court of Federal Claims ordered supplemental briefing, providing ACLR ample opportunity to be heard. *See generally Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (noting concern underlying waiver is party's inability to respond).

Turning to the merits, we agree with the Court of Federal Claims that the government is entitled to summary judgment, as CMS committed no breach, either of contract or of its duty of good faith and fair dealing. There is no error in the trial court's conclusion that CMS' terminations relating to the 2007 and 2010 audits constituted retroactive, constructive terminations for convenience, consistent with the FAR 52.212-4(l) clause incorporated into the pertinent task order and, thereby, into the Part D RAC Contract. That provision expressly authorized CMS, as the ordering agency, "to terminate [the task order], or any part hereof, for its sole convenience," and further provided that "[i]n the event of such termination, the Contractor," ACLR,

---

[1]    *See* Open. Br. at 30 (citing *Van Engers v. Perini Corp.*, No. 92-1982, 1993 WL 235911, at *10 (E.D. Pa. June 28, 1993); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 Civ.2952 LBS, 2003 WL 22801519, at *5 (S.D.N.Y. Nov. 24, 2003)).

"shall immediately stop all work hereunder." J.A. 4624. We have repeatedly held that termination pursuant to such a provision "will not be considered a breach but rather a convenience termination." *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed. Cir. 1988). Even after drawing all reasonable inferences in favor of ACLR as the non-moving party, the record only supports a finding that CMS constructively terminated the 2007 and 2010 audits for convenience.

Moreover, while the government "may not resort to the doctrine of constructive termination for convenience if it evinced bad faith or a clear abuse of discretion in its actions," *JKB*, 18 F.4th at 709 (internal quotation marks omitted), ACLR has failed to adduce evidence from which a reasonable factfinder could find that ACLR met its "very weighty" burden of showing that CMS acted in such a manner, *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996); *see also Kalvar Corp. v. United States*, 543 F.2d 1298, 1301 (Ct. Cl. 1976) ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act conscientiously in the discharge of their duties.") (internal quotation marks omitted); *see also S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) ("[T]he holdings of the Court of Claims . . . before the close of business on September 30, 1982 . . . [are] herewith adopted by this court sitting in banc."). The specific type of bad faith ACLR accuses CMS of committing is "enter[ing] into the Part D RAC Contract with no intent to honor the contract," Open. Br. at 21, but it points to no evidence that reasonably supports this assertion. Instead, it does little more than identify evidence showing that *after* entering into the contract CMS determined that the PWS was problematic and needed to be replaced.[2] This evidence

---

[2]   In its briefing and at oral argument, ACLR cited to various pieces of evidence, based on which it contends a

provides an explanation for why the government terminated the contract for convenience, but does not raise a genuine dispute of fact as to whether CMS acted in bad faith when entering into the Part D RAC Contract.

To the extent that our analysis to this point focuses primarily on ACLR's claim for breach of contract, the outcome is no different for its claim for breach of the implied covenant of good faith and fair dealing. "Every contract, including one with the federal government, imposes upon each

---

reasonable factfinder could find that the government entered into the RAC Part D Contract having no intent to perform. *See, e.g.*, Open. Br. at 22-23, 34-36 (citing evidence); Reply Br. at 17 (same); Oral Arg. at 26:40-29:10, *available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1190_05082024.mp3 (same). We have reviewed the totality of this evidence and conclude, as did the trial court, that it cannot reasonably be viewed as sufficient to allow ACLR to satisfy its burden. ACLR's evidence almost entirely falls into the following categories: (i) evidence post-dating when the government entered into the contract, *see, e.g.*, J.A. 1290 (July 2011 email); J.A. 1352 (December 2013 email); (ii) evidence showing government concerns with the PWS and the need to replace it with the SOW, *see, e.g.*, J.A. 1251 (deposition testimony of CMS personnel describing development of SOW due to government disagreements with PWS); J.A. 1034 (deposition testimony of CMS personnel agreeing that ACLR was unable to perform auditing activities until PWS was replaced); (iii) evidence showing CMS obtained assistance from another contractor, Booz Allen Hamilton, Inc., around the same time it entered into the contract with ACLR, *see* J.A. 1028, 1249-50; and (iv) evidence chronicling CMS' directions to ACLR to "hold off on" its collection efforts, J.A. 1610-14, and to alter its methodology, J.A. 1150-57, 1160-70, 1617-18.

party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019). This duty "imposes obligations on both contracting parties . . . not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). We agree with the Court of Federal Claims that the record, viewed in the light most favorable to ACLR, does "not rise to the level of an evasion of the spirit of the bargain." J.A. 5119 (internal quotation marks omitted).

In particular, the implied covenant does not give rise to any obligation on the part of the government to pay ACLR *contingency fee payments* when ACLR failed to recover any overpayments. "The implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). The contract between ACLR and the government only obligated CMS to make contingency fee payments in relation to Medicare Part D overpayments ACLR actually recovered. For the 2007 and 2010 audits, ACLR made no such recoveries. The implied covenant cannot be used to expand CMS' payment duties beyond those to which it agreed. Hence, ACLR's claim lacks merit.

For these reasons, the Court of Federal Claims properly denied ACLR's summary judgment motion, and granted the government's motion, with respect to ACLR's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

B

ACLR additionally challenges the Court of Federal Claims' holding that the "percentage of the contract price" portion of the FAR-mandated damages owed by the government for its termination by convenience is zero. That is,

according to ACLR, even though it never recovered a single dollar for CMS in connection with the 2007 and 2010 audits, the government should still, it insists, pay it a 7.5% contingency fee based on the tens of millions of dollars of potential overpayments ACLR identified. Like the Court of Federal Claims, we reject this contention.

"[T]he effect of a constructive termination for convenience is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause." *Kalvar*, 543 F.2d at 1304. Specifically, here, ACLR's recovery of damages is limited to what is provided for in FAR 52.212-4(l), which was incorporated into the Part D RAC Contract.[3] It provides for potential recovery by a contractor of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of [CMS] using its standard record keeping system, have resulted from the termination." J.A. 4624.

We agree with the Court of Federal Claims that this provision means ACLR, as the party injured by a termination for convenience, may recover "a percentage of the contract price reflecting the percentage of work" ACLR performed prior to CMS' termination. J.A. 7204. Contrary to ACLR's position, however, we further agree with the Court of Federal Claims that ACLR "cannot recover under th[is] first category of compensation" because payment

---

[3] ACLR wrongly predicated its summary judgment motion for termination for convenience damages on FAR 52.249-2(g), which applies to fixed-price, non-commercial item contracts. *See* 48 C.F.R. § 52.249-2(g). As the trial court rightly held, damages here are instead governed by FAR 52.212-4(l), which is expressly cited in the Part D RAC Contract.

under the Part D RAC Contract was contingent on recovering improper payments, and ACLR's "work had not yet reached the stage of recovering improper payments." J.A. 7205. The trial court correctly concluded that while ACLR "had performed some portion of the work under the contract," its contract price "was to be paid based on a contingency fee – a portion of [ACLR's] recovery of any improper payments." *Id.* Because ACLR's work "was terminated at the data analysis stage, . . . the amount to which [ACLR] was technically entitled . . . remained at zero." *Id.*

The task order governing the audits expressly states "[t]he recovery audit contractor will receive 7.5% of all amounts collected. The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayments." J.A. 1175. It further, and unambiguously, provides that "[t]he recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments not recovered/collected." *Id.* Thus, the Court of Federal Claims did not err in finding that the contract price "remained at zero" until "the recovery audit contractor collects the Medicare overpayments." J.A. 7205. Since 7.5% of zero is zero, the trial court correctly held that ACLR could not prove entitlement to any compensation in the form of a "percentage of the contract price."

## C

ACLR next attacks the Court of Federal Claims' refusal to allow it to recover as damages attorney's fees and other costs purportedly incurred in preparation of settling its claim against the government. ACLR sought to recover these "settlement" costs for the period prior to the March 23, 2020 effective date of the constructive termination for convenience – i.e., the date the trial court issued its opinion in *ACLR I* – and for the period thereafter. We agree with the Court of Federal Claims' denial of ACLR's motion for summary judgment on its claim for these costs.

The Court of Federal Claims correctly understood that FAR 52.212-4(l) requires the government, after terminating for convenience, to make "payment of reasonable charges" incurred by the contractor that result from the termination. J.A. 7204 (internal quotation marks omitted). Such reasonable charges potentially include "settlement expenses." *Id.* But, as the trial court also rightly concluded, recoverable settlement expenses cannot include legal fees or other charges associated with ACLR's pressing of a claim against the United States, as such fees are "not allowable costs, absent a waiver of sovereign immunity." J.A. 7214; *see also Chiu v. United States*, 948 F.2d 711, 714 (Fed. Cir. 1991) ("Absent . . . specific statutory waiver of sovereign immunity, attorney fees may not be recovered in suits against the United States."); FAR 31.205-47(f)(1) (stating "[c]osts . . . incurred in connection with . . . prosecution of claims or appeals against the Federal Government" are "unallowable"). ACLR identifies no such waiver of sovereign immunity. Because ACLR was pressing its claim against the government up until the time the Court of Federal Claims declared the retroactive constructive termination for convenience, in March 2020, all costs associated with ACLR's claim until that point are associated with pressing the claim against the United States and are not recoverable. *See Kalvar*, 543 F.2d at 1304-06 (ruling similarly in case where, as here, "the termination is constructive, by imposition of the court, and hence plaintiff had no opportunity to engage in settlement negotiations," and therefore could not recover "settlement costs" for the period prior to the constructive termination).

While ACLR's legal fees and other costs associated with preparation, presentation, and pursuit of settlement became potentially recoverable after the March 2020 constructive termination, the Court of Federal Claims properly rejected these as well, because ACLR failed to segregate its costs and show that what it was seeking for this period were reasonable charges. J.A. 7214. We see no error

in the trial court's legal analysis on this point or its determination that the record was insufficient to support a reasonable finding on ACLR's behalf.  ACLR's speculation as to what might have happened had it "been issued a timely termination for convenience of the Part D RAC Contract in November 2011," and complaints about "the unfair burden imposed on ACLR by the retroactive constructive termination for convenience," Open. Br. at 43, 46, provide no basis for us to differ with the Court of Federal Claims' conclusions.

## D

Finally, ACLR challenges the Court of Federal Claims' grant of summary judgment to the government on the issue of ACLR's record keeping system.  FAR 52.212-4(l) limits recovery of reasonable charges to those a contractor "can demonstrate to the satisfaction of the ordering [agency] using its standard record keeping system, have resulted from the termination."  J.A. 4624.  Looking to dictionary definitions, the Court of Federal Claims held that a "standard record keeping system" requires "a regular, organized method for tracking relevant costs," J.A. 7; *see also* J.A. 5-6 (looking to definitions of "standard" and "system" and determining "standard system" is "a regularly used, carefully thought-out method that involves a set of organizing and orderly procedures"); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1320 (Fed. Cir. 2003) ("[W]e may consult dictionaries [for statutory term's] ordinary, established meaning.").  The Court of Federal Claims then determined that the record before it, which consisted of a mass of documents as well as a declaration from ACLR's Chief Executive Officer, "merely describes a vast collection of documents, some of which reflect post hoc estimates, rather than a systematic or organized method of

tracking costs relevant to a particular project." J.A. 7.[4] This, in the trial court's view, could not reasonably be considered a "standard record keeping system."

Reviewing the evidence in the light most favorable to ACLR, we agree with the Court of Federal Claims that no reasonable factfinder could view ACLR's record keeping system as regularly used, carefully thought-out, or even organized and orderly. Instead, it "belies the plain meaning of a standard system to conclude that virtually every document in [ACLR's] possession, along with estimates to supply records not kept contemporaneously, meets this regulatory requirement." *Id.* We agree with the Court of Federal Claims that "[t]o find that plaintiff's records are sufficient to recover pursuant to FAR 52.212-4(l) would be to read both 'standard' and 'system' out of the regulation." J.A. 7.

ACLR and amicus contend that the trial court's interpretation "ignores the reference to 'its' in the phrase 'its standard record keeping system,' . . . [which] is meant to allow the contractor to demonstrate costs by using '*its* standard record keeping system,' not some specific or overly sophisticated time tracking system." Open. Br. at 49. We agree to the limited extent that FAR 52.212-4(l)'s reference to "its" does not impose any broad prescription as to precisely how every government contractor must maintain its books and records. But this does not mean, contrary to ACLR and amicus, that ACLR could fail to contemporaneously track and allocate its costs and then, only for purposes of litigation, dump essentially every record it can find on the court, and expect the court to sift

---

4    ACLR unpersuasively asserts that the Court of Federal Claims "wholly ignore[d]" its CEO's declaration. Open. Br. at 55. In fact, the court expressly considered and cited, repeatedly, to that declaration in its opinion. J.A. 3, 6.

through it and find it to be a "standard record keeping system." Contrary to ACLR's characterization, the Court of Federal Claims did not hold that a "standard record keeping system" must be "specific" or "overly sophisticated." Open. Br. at 49. Nor, in affirming, do we.

Thus, we affirm the award of summary judgment to the government.

IV

We have considered ACLR's remaining arguments and find them unpersuasive. Accordingly, for the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

**AFFIRMED**

COSTS

No costs.